IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| JOHN T. NELSON, | CASE NO. 3:06-cv-00070 |
| *Plaintiff,* | |
| v. | MEMORANDUM OPINION |
| LORI GREEN, ET AL., | |
| *Defendants.* | JUDGE NORMAN K. MOON |

This matter is before the court on two motions to dismiss Plaintiff's Second Amended Complaint: a motion to dismiss filed by defendants Cindy Casey, John Freeman, Lori Green, and Kathy Ralston ("Defendants"), and a motion to dismiss filed by defendant Viola Vaughan-Eden ("Vaughan-Eden"). Plaintiff filed an opposition to both, and Defendants and Vaughan-Eden filed replies. For the following reasons, I will grant Defendants' motion to dismiss Counts I–IV and VI of Plaintiff's Second Amended Complaint, and I will grant Vaughan-Eden's motion to dismiss Counts I, II, VI and VII. I will grant Plaintiff leave to amend Count V of his Second Amended Complaint as to all defendants.

## I.   BACKGROUND

This case stems from Plaintiff's allegation that four employees of the Albemarle County Department of Social Services ("ACDSS"), along with a social worker who worked at their direction, abused their official positions and government powers to coerce Plaintiff's daughter to falsely accuse her father of sexual abuse. Plaintiff filed his original complaint in December 2006, and this case was stayed until the underlying state court proceedings concluded. On

January 9, 2013, the Circuit Court of Albemarle County (Higgins, J.) entered a final order, and no appeal was filed.

Plaintiff and the mother of his daughter, who is now twelve years old, were never married.  Starting in 2003 and into 2004, in the midst of a custody battle, the mother began alleging that Plaintiff had sexually abused their child.  Plaintiff states that the four ACDSS Defendants became aware of the case around that time, as the mother brought the child to various therapists, doctors, and emergency rooms for evaluations.  Plaintiff states that several therapists reported to Green, a case worker for Child Protective Services ("CPS") (an office of ACDSS), that the mother's allegations were false, and that the mother was attempting to coach the child or manipulate the therapists into making a false finding of abuse.[1]  Plaintiff states that one of those medical examinations, which took place at the U.Va. Medical Center's Emergency Room, prompted a report that was sent to the Defendants about the mother's conduct.

In August 2004, the mother presented her allegations to Judge Berry, of the Juvenile & Domestic Relations District Court for the City of Charlottesville (J&DR Court).  Judge Berry rejected the mother's allegations that Plaintiff had abused their child.  The J&DR Court order, dated August 10, 2004, required that any future request by the mother to take the child to a therapist had to be approved by the J&DR Court's therapist, Wendy Carroll.  That order also required that an ACDSS employee or designee accompany the child to any future evaluation.

The ACDSS Defendants began investigating the mother's allegations several months later, in December 2004.  According to Plaintiff, the four ACDSS Defendants intentionally

---

[1] Defendant Lori Green served as the lead CPS case worker in the investigation and prosecution of Plaintiff's case. Defendant Cindy Casey served as Green's direct supervisor in the CPS office throughout the investigative process. According to Plaintiff, Casey possessed final authority to establish and approve the CPS's official policies and customs.  Defendant Kathy Ralston served as Director of ACDSS, and in that capacity possessed final authority to establish and approve the Department's official policies and customs.  Defendant John Freeman served as Assistant Director of ACDSS throughout the investigative process and, according to Plaintiff, was responsible for reviewing the findings and decisions made by Green and Casey.

violated the J&DR Court's order by sending the child to be questioned by Vaughan-Eden without obtaining Wendy Carroll's prior approval.[2]  Plaintiff also states that Wendy Carroll, the child's *guardian ad litem*, had specifically objected to any evaluation by Vaughan-Eden, who is a licensed clinical social worker in private practice in Newport News, Virginia.[3]  Defendants further violated Judge Berry's order by failing to accompany Plaintiff's daughter on all visits to Vaughan-Eden in Newport News.  Prior to Vaughan-Eden's evaluation, Plaintiff alleges that Green provided Vaughan-Eden with false information about him, instructed her not to talk to Plaintiff, and concealed all prior professional evaluations that had concluded that the child had not been abused.

Vaughan-Eden did not videotape the back-to-back, 45-minute interviews she held with the child in February 2005, who at the time was four years old.  Plaintiff alleges that Vaughan-Eden worked with Green during both sessions, and instructed his daughter to make a disclosure of abuse.  Plaintiff states that in the second session, Green and Vaughan-Eden jointly pressured his daughter through leading questions to tell them "Who hurt your butt?"  Plaintiff states that his daughter became "visibly anxious" during the sessions, "bounc[ed] off the walls and the floor," and "made animal calls and cried out" before eventually saying "Daddy."  2d Am. Compl. ¶ 48.  Plaintiff states that experts in the state case testified that these sessions were traumatizing and emotionally and psychologically abusive to the child.  Plaintiff alleges that Vaughan-Eden's evaluation was corrupt, and was set up for the purpose of manufacturing a false disclosure of abuse.  Vaughan-Eden's report implicated Plaintiff in sexually abusing his daughter.

---

[2] In reply, Defendants state that the Virginia Department of Social Services ("State DSS") found that the child's mother misled Green into believing that Wendy Carroll had agreed that the child could be seen by another forensic evaluator, and that the mother and her attorney convinced Green and her supervisor (Casey) to approve the employment of Vaughan-Eden.  Defs.' Reply to Pl.'s Opp. 4 (Docket No. 130).

[3] Plaintiff alleges that Vaughan-Eden was first identified by the mother's attorney, who had a close working relationship with Vaughan-Eden, for the sole purpose of advancing the mother's agenda.  2d Am. Compl. ¶ 27.

The four ACDSS Defendants used that report to support a petition for a protective order in the J&DR Court of Albemarle County later that month.  Plaintiff alleges that Green and Vaughan-Eden executed an affidavit that misrepresented what his daughter had said, and omitted crucial facts pertaining to Vaughan-Eden's evaluation.  Plaintiff alleges that Green and Vaughan-Eden continued those misrepresentations through their testimony before the J&DR Court.  After multiple hearings, the J&DR Court found that the child had been abused, but could not determine which parent was responsible.  The J&DR Court found that the child's disclosure was "tainted" by the procedures Green and Vaughan-Eden employed, and was therefore too unreliable to establish a finding of abuse by the father.  The Court issued a final protective order in April 2005 naming both the Plaintiff and the mother as respondents.[4]

Before the J&DR Court issued its final order, the ACDSS Defendants pursued an administrative action against Plaintiff resulting in a Level 1 "founded" disposition, which indicated that Plaintiff had sexually abused his child.  As a result of that disposition, Plaintiff's name was placed on a central registry of child sex abusers.  The disposition was also used to restrict Plaintiff's visitation with his daughter to no more than three hours per week, with adult supervision.[5]  Plaintiff appealed the Level 1 administrative finding to the State DSS.  In July 2006, a hearing officer overturned the Level 1 "founded" disposition against Plaintiff.  According to the State DSS, the Defendants' agency "did not even come close to proving its case by a preponderance of the evidence."

However, Defendants did not dismiss their abuse allegations or revise their visitation restrictions following that ruling, and so proceedings in state court continued.   Those

---

[4] The J&DR Court entered a preliminary protective order following the Defendants' February 2005 petition.  An adjudicatory hearing took place in March 2005, and the J&DR Court entered a further protective order in April 2005.

[5] The weekly three-hour restriction remained in place from February 2005 until September 2009.

proceedings culminated in a thirteen-day trial in Albemarle Circuit Court in August 2009. Following the conclusion of that trial, the Circuit Court held in September 2009 that (1) the Father did not abuse the Child in any manner, and (2) the Mother had engaged in a pattern of interference in the Father's relationship with the Child, but did not abuse the Child. The Circuit Court also enjoined the Mother from interfering further in the Child's relationship with the Father. The mother appealed, and the Court of Appeals issued a decision on January 11, 2011, reversing certain evidentiary rulings from the trial, as well as the definition of "abuse" as applied to the Mother's conduct. Finally, on January 9, 2013, the Circuit Court reaffirmed its September 16, 2009 order, including its previous findings that (1) the Father did not abuse the Child in any manner, and (2) the Mother engaged in a pattern of interference in the Father's relationship with the Child, and implemented an injunction against the Mother prohibiting any further interference in the Child's relationship with the Father. The Circuit Court also held that Judge Berry's initial August 2004 order, from the Charlottesville J&DR Court, was to remain in effect.

Here in federal court, on March 14, 2013, Magistrate Judge B. Waugh Crigler lifted the stay that had been entered on August 8, 2007, and granted Plaintiff leave to file a second amended complaint. Plaintiff's Second Amended Complaint features seven distinct causes of action: substantive due process/deprivation of liberty, under 42 U.S.C. § 1983 (all defendants) (Count I); conspiracy under 42 U.S.C. § 1983 (all defendants) (Count II); supervisory liability under 42 U.S.C. § 1983 (Green, Casey, Freeman, and Ralston) (Count III); malicious prosecution (Green, Casey, Freeman, and Ralston) (Count IV); intentional infliction of emotional distress (all defendants) (Count V); loss of parent's companionship and society of a child (all defendants) (Count VI); and professional negligence (Vaughan-Eden) (Count VII).

## II.   LEGAL STANDARD

In order to survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must contain facts sufficient "to raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). A claim is plausible if the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," and if there is "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When considering a Rule 12(b)(6) motion, a court must accept all factual allegations in the complaint as true, and must draw all reasonable inferences in favor of the plaintiff. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). However, a court is not required to "accept the legal conclusions drawn from the facts" or "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Eastern Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000) (citations omitted).

## III.   DISCUSSION

### a.  Motion to Dismiss by Defendants Cindy Casey, John Freeman, Lori Green, and Kathy Ralston

#### 1.  The Eleventh Amendment

Defendants begin their motion by arguing that at least some of Plaintiff's claims are barred by the Eleventh Amendment. Defendants acknowledge that Plaintiff's Second Amended Complaint clearly alleges that he is suing them in their "individual capacity." *See* 2d Am. Compl. ¶ 13. Still, Defendants contend that Plaintiff's action is largely an official capacity suit, because "the bulk of [Plaintiff's] claims from ¶ 58 forward in the Second Amended Complaint are actually claims against ACDSS . . . ." Defs.' Br. in Supp. of Mot. to Dismiss 2 (Docket No.

123).[6]  In particular, Defendants note that ¶ 104 alleges that a variety of their actions were taken in conformity with the policies and customs of ACDSS, which is an arm of the state.[7] Accordingly, Defendants contend that Plaintiff's claims arising from those policies and customs should be barred by the Eleventh Amendment.  *See Cash v. Granville Cnty. Bd. of Educ.*, 242 F.3d 219, 224 (4th Cir. 2001) (The Eleventh Amendment bars a suit if it "adversely affect[s] the dignity of the state as a sovereign . . . .").

However, regarding Plaintiff's supervisory-liability claim (¶ 104), an individual defendant may be held personally liable where there is an affirmative link between official misconduct and the adoption of any plan or policy by government officials that expressly or otherwise shows their authorization or approval of such misconduct.  *See Rizzo v. Goode*, 423 U.S. 362, 371 (1976).  In this case, Plaintiff contends that he seeks to hold Defendants liable either for: (1) establishing, enforcing, or implementing certain policies and customs, or (2) failing to do so with respect to other policies.  Pl.'s Opp. to Defs.' Br. in Supp. 13 (citing *Slakan v. Porter*, 737 F.2d 368, 374 (4th Cir. 1984) (finding prison policies and customs regarding the use of water hoses to be relevant in establishing officials' supervisory liability.)) (Docket No. 127).  Ultimately, government officers who abuse the power of their office while violating a constitutional right can be held personally liable, *see Hafer v. Melo*, 502 U.S. 21, 31 (1991), and Plaintiff's claims against these Defendants in their individual capacities, including his claim for supervisory liability, are not barred by the Eleventh Amendment.

---

[6] Paragraph 58 of Plaintiff's Second Amended Complaint picks up after the allegedly coerced disclosure of sexual abuse had taken place, and, moving forward, details Plaintiff's allegations regarding Defendants' actions in connection with the petition they filed in February 2005, as well as the administrative and court proceedings that followed.

[7] In *Nelson v. Herrick*, 2011 WL 5075649 (W.D. Va. Oct. 26, 2011), I held that "ACBSS and ACDSS are both arms of the Commonwealth of Virginia, at least when it comes to their role in protecting children, and they are therefore shielded from suit by sovereign immunity."  *Id.* at *11.

2.   <u>Defendants' Claim for Absolute Immunity</u>

Under Virginia law, social workers are entitled to absolute immunity for the prosecutorial acts of preparing and filing removal petitions.  *Vosburg v. Dep't of Social Servs.*, 884 F.2d 133, 137 (4th Cir. 1989) ("[T]he filing of a removal petition is, in essence, the start of judicial proceedings against the parent or guardian of a minor child, and the duties of the social worker at that point are those of an advocate in the process.").  Accordingly, the *Vosburg* court afforded absolute immunity to the social worker defendants that filed a removal petition, because at the time they were "acting in a prosecutorial, rather than an investigative or 'policing' capacity."  *Id.* at 135.  Defendants are entitled to the same absolute immunity for filing the February 2005 petition in this case.

However, absolute immunity does not extend to social workers' investigative or administrative acts, for which they are entitled only to qualified immunity.  *Id.* at 138 (citing *Imbler v. Pachtman*, 424 U.S. 409, 430–31 (1976) (recognizing that a prosecutor cast "in the role of an administrative or investigative officer" should receive only qualified immunity.)).[8]  For the inquiry into whether an act was "prosecutorial" (and therefore entitled to immunity), or investigative/administrative, the court must apply a functional analysis that examines the particular wrongs that the party is alleged to have committed.  *Van de Kamp v. Goldstein*, 555 U.S. 335, 342 (2009).  "[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question."  *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993) (citations omitted) (holding absolute immunity inapplicable to a charge of pre-indictment fabrication of evidence).

---

[8] The *Vosburg* court "emphasize[d] . . . that our grant of absolute immunity applies only to those activities of social workers that could be deemed prosecutorial. . . . [And] we in no way intend our decision to be read as a holding that such workers are immune from liability arising from their conduct in investigating the possibility that a removal petition should be filed."  *Id.* at 138.

Defendants contend that they were acting in a prosecutorial (rather than an investigative or administrative) capacity at all times leading up to the February 2005 petition, from which Plaintiff's § 1983 claims largely stem, as well as for their actions that followed.  Defendants note that the child's evaluation was performed by another party (Vaughan-Eden), and the abuse disclosure was repeated, allegedly at the direction of Vaughan-Eden, in the presence of an Albemarle County Police Department detective.  Accordingly, Defendants assert that they are entitled to absolute immunity for all actions pertaining to their decision to file, as well as the prosecution of, the February 2005 petition.

In response, Plaintiff cites each allegation contained in his Second Amended Complaint that he contends to be an investigative or a non-prosecutorial administrative action taken by the Defendants in this case, some of which allegedly occurred after the February 2005 petition had been filed.  *See* Pl.'s Opp. to Defs.' Br. in Supp. 15–17.  Plaintiff also notes in his opposition that Green testified in the state case that there was no open investigation against Plaintiff in late 2004 and early 2005, and contends that taking his child to Vaughan-Eden, and Green's actions during the February 2005 evaluation, should not be deemed "prosecutorial" acts in hindsight.  In reply, Defendants acknowledge that Plaintiff's Second Amended Complaint contains certain non-prosecutorial allegations, but argue that the "bulk" of those allegations "pertain only to Defendant Green for actions and omissions pre-February 9, 2005 ACDSS Petition filing."  Defs.' Reply to Pl.'s Opp. 6.

Plaintiff's allegations predating the February 2005 petition are primarily directed at Green's alleged misconduct, rather than specific actions taken by the other ACDSS Defendants. Still, Plaintiff alleges that the Defendants collectively violated Judge Berry's August 2004 order, ignored Vaughan-Eden's lack of qualifications and training, and allowed his daughter to be

evaluated in a manner that was corrupt and set up to manipulate a disclosure of abuse. Accordingly, I will not award absolute immunity to any of the ACDSS Defendants for their investigative or non-prosecutorial administrative actions predating the February 2005 petition.[9]

Plaintiff also alleges that Green's affidavit filed in support of the February 2005 petition misrepresented and omitted critical facts regarding the manner in which she and Vaughan-Eden obtained the disclosure from his child, and mischaracterized his daughter's statements during the evaluation.  2d Am. Compl. ¶ 60.  A prosecutor does not have absolute immunity if he or she fabricates evidence during a preliminary investigation, *Buckley*, 509 U.S. at 275, or if he or she makes false statements in a sworn affidavit to support an application for an arrest warrant, *Kalina v. Fletcher*, 522 U.S. 118, 129–130 (1997).  However, here in the Fourth Circuit, immunity from liability extends to social workers for the preparation and filing of a removal petition, even if false statements are submitted in support of removal.  *Gedrich v. Fairfax Cnty. Dep't. of Family Servs.*, 282 F. Supp. 2d 439, 467 (E.D. Va. 2003) (citing *Vosburg*, 884 F.2d at 135).

To illustrate, in *Gedrich*, the court found that plaintiffs had stated a procedural due process claim against a social worker, insofar as they alleged she submitted knowingly false statements in her affidavit in support of emergency removal to the J&DR Court.  *Id.*  However, because that submission "pertain[ed] to [defendant's] filing of the petition in the J&DR Court," the court held that the social worker defendant "was absolutely immune from suit in this regard."

---

[9] Regarding any prosecutorial actions taken after February 2005, Plaintiff contends that Defendants are nevertheless not immune because they maintained a child-abuse petition against him long after ACDSS's parent agency ruled (in July 2006) that ACDSS had no justifiable case.  *See Snell v. Tunnell*, 920 F.2d 673, 696 (10th Cir. 1990) (holding that defendant not entitled to immunity with respect to prosecutorial actions that had no color of authority). However, I rejected a similar argument in *Nelson v. Herrick*, regarding the actions taken by the prosecutor in this case.  *See Herrick*, 2011 WL 5075649, at *7 n.6 ("I find the statutory authority at issue in the instant case to be distinguishable from that in *Snell*, in that here, unlike in *Snell*, no statute or directive specifically withdrew Herrick's authority to proceed after the State DSS had issued its ruling.").  While Plaintiff notes that the ACDSS director acts as the state commissioner's agent in implementing the provisions of federal and state law, *see* Va. Code Ann. § 63.2-333, this general provision does not conclusively establish that Defendants' prosecutorial authority evaporated after the State DSS issued its ruling in this case.  Once again, I find that Defendants are absolutely immune in this case for their actions in state court, including filing the February 2005 petition and offering their testimony in subsequent proceedings.

*Id.* (citation omitted). Accordingly, Green and the rest of the Defendants are absolutely immune for any misstatements contained in their affidavits, along with their subsequent testimony in state court. *See Holloway v. Brush*, 220 F.3d 767, 775 (6th Cir. 2000) ("[S]ocial workers are absolutely immune . . . when they are acting in their capacity as legal advocates—initiating court actions or testifying under oath . . . ."[10]

### 3. Defendants' Claim for Tort Immunity

Defendants also claim that they are entitled to immunity as to Plaintiff's tort claims under Virginia's reporter immunity statute, Va. Code Ann. § 63.2-1512 ("Immunity of person making report, etc., from liability"), given that, according to Defendants, they were acting at all times to protect the child. More fully, Virginia's reporter immunity statute provides that social workers who have a reason to suspect that a child is abused, and who report that abuse pursuant to § 63.2-1509, "shall be immune from any civil or criminal liability in connection therewith, unless it is proven that such person acted in bad faith or with malicious intent." Va. Code Ann. § 63.2-1512.

The Fourth Circuit discussed the purpose of the statute in *Wolf v. Fauquier County Bd. of Supervisors*, 555 F.3d 311 (4th Cir. 2009), which held that the defendants in that case were entitled to its protections: "Virginia's reporting statute and its social services apparatus are both based on the assumption that false positives—mistaken reports of child abuse followed by DSS investigations—are less harmful than false negatives—serious harm to a child that could have been prevented but was not." *Id.* at 323 (finding that the "life-coach" defendant's report that her client was suicidal and planning to harm her children was not made in bad faith). However,

---

[10] In making this finding, I acknowledge that, according to Plaintiff, the Circuit Court dismissed the Defendants' agency from the state case in February 2009 on the basis that the Defendants were not serving the child's best interests, and denied their request for an affirmative finding that they had acted properly. 2d Am. Compl. ¶ 80. I also note Plaintiff's allegation that Green misrepresented to the J&DR Court that her agency would adjust Plaintiff's visitation time with his daughter after the State DSS had issued its findings, but then declined to do so. *Id.* at ¶ 101. Despite this, Green was acting within her capacity as a legal advocate at all times while testifying in state court, and for that reason I grant her absolute immunity for those actions in this case.

Plaintiff specifically alleges that the Defendants in this case acted in bad faith, *see* 2d Am. Compl. ¶ 102(a–y), which must be proven to overcome "the strong presumption that immunity applies" to reporters of suspected child abuse.  555 F.3d at 318.[11]  Plaintiff also notes that *Wolf* did not involve the actual impairment of the parent's relationship with her children, and the district court had the benefit of full discovery and judged the totality of the defendants' conduct at the summary judgment stage.  *Id.* at 317.  Given Plaintiff's allegations, I will not award Defendants immunity under § 63.2-1512 as to Plaintiff's tort claims at this time.

### 4.  Plaintiff's Second Amended Complaint

### A.  Count I: Substantive Due Process/Deprivation of Liberty/§ 1983

Plaintiff alleges that the Defendants violated his right to a familial relationship with his daughter through their various instances of misconduct in this case.  The concept of familial privacy, shielded by the Due Process Clause of the Fourteenth Amendment,[12] has been restricted to "(1) thwarting governmental attempts to interfere with particularly intimate familial decisions, and (2) voiding government actions that sever, alter, or otherwise affect the parent/child relationship."  *Hodge v. Jones*, 31 F.3d 157, 163 (4th Cir. 1994) (footnotes omitted).  Plaintiff alleges that Defendants' actions severely interfered with and altered his relationship with his daughter for more than four years, causing emotional, psychological, and financial hardships. During that time, Plaintiff was restricted to three hours of visitation per week with his daughter

---

[11] While the Virginia General Assembly has not directly defined "bad faith" in the context of § 63.2-1512, "it is plain that Virginia law requires something more than a mistaken report, or a report based on a misunderstanding, or even a report that was negligently tendered."  *Id.* at 318 (citation omitted).  "[T]he statute provides that immunity will dissolve only in those infrequent circumstances where someone used the reporting system for purposes other than that for which it was designed—namely, the protection of children."  *Id.* at 319.  Here, Plaintiff alleges that Defendants engaged in an intentional, arbitrary, and egregious campaign to deprive him of a parental relationship with his daughter.

[12] "The substantive component of the Due Process Clause 'bar[s] certain government actions regardless of the fairness of the procedures used to implement them.'"  *Weller v. Dep't. of Social Servs.*, 901 F.2d 387, 391 (4th Cir. 1990) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)).

12

in the presence and supervision of another adult.[13]  On many weeks, Plaintiff states that he was prohibited from seeing his daughter at all.  In sum, Plaintiff alleges that the Defendants abused their government powers in an intentional, arbitrary, egregious, and grossly negligent manner.

Defendants contend that the terms of the February 2005 order were not sufficient to deprive Plaintiff of his right to familial privacy.  Defendants note that Plaintiff did not have physical custody at the time of the February 2005 petition, and that he could still visit his daughter after the protective order was in effect.[14]  To be sure, custody is considered a "greater liberty interest" than visitation, and calls for stronger, more immediate protections.  *See Weller*, 901 F.2d at 394.  In *Weller*, the Fourth Circuit noted that the availability of adequate post-deprivation remedies satisfied the procedural due process requirements in the visitation context, following the emergency removal of a child, but held that a transfer in custody "requires something more."  *Id.* (comparing *Fitzgerald v. Williamson*, 787 F.2d 403 (8th Cir. 1986)).

However, noncustodial parents still may have a recognized liberty interest in their relationship with their children.  *See Brittain v. Hansen*, 451 F.3d 982, 999–1000 (9th Cir. 2006) ("[Plaintiff] has a protected liberty interest in the 'companionship, care, custody, and management' of her child by virtue of her visitation rights[.]").[15]  The court in *Weller* found plaintiff's reliance on substantive due process to be "misplaced," following the emergency removal of his child upon suspicion and evidence of child abuse.  *Id.* at 391.  Conversely, the restrictions Plaintiff faced in this case, lasting four and a half years, were based on an

---

[13] Plaintiff characterizes his visitation rights with his daughter prior to the entry of the February 2005 protective order as "liberal."

[14] On August 4, 2004, the Charlottesville J&DR Court ordered legal custody to be shared by the parents, but physical custody to continue with the mother.

[15] Ultimately, the *Brittain* court did not decide the question of "whether interference that affects the existence of visitation rights altogether, rather than discrete instances of visitation, might give right to a viable claim."  *Id.* at 995–96 (holding that a one-time, temporary interruption in visitation rights did not deprive a noncustodial parent of a liberty interest sufficient to support a substantive due process claim.).

administrative finding issued before the J&DR Court rendered its own order, and which both state courts and the Defendants' parent agency later rebuked.  At bottom, I find that the type of visitation restrictions Plaintiff faced in this case—considering the discredited basis, degree, and enduring nature of those restrictions, during a critical time in his daughter's life—were sufficient to implicate the substantive component of the Due Process Clause.

The Ninth Circuit has also held that "deliberately fabricating evidence in civil child abuse proceedings violates the Due Process clause of the Fourteenth Amendment when a liberty or property interest is at stake."  *Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1108 (9th Cir. 2010).  While the court in *Costanich* affirmed qualified immunity for a social worker defendant where that constitutional right had not been clearly established, the court put government officials in the Ninth Circuit on notice that deliberately falsifying evidence in a child abuse investigation, where it resulted in the deprivation of a liberty interest, violated constitutional rights.  *Id.* at 1115.  To sustain a deliberate fabrication of evidence claim under substantive due process, the court stated that a plaintiff must, at a minimum, show that "Defendants [either] continued their investigation of plaintiff despite the fact that they knew or should have known that [plaintiff] was innocent" or "used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information."  *Id.* at 1111 (quoting *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001)).

At the time of this opinion *Costanich* had not been cited in the Fourth Circuit, or by any other Court of Appeals outside of the Ninth Circuit, and I do not intend to establish its constitutional holding here.  Still, I find that Plaintiff has sufficiently alleged a § 1983 violation against Green, the lead CPS case worker for the investigation in this case.  While Plaintiff alleges

that Defendants collectively violated Judge Berry's August 2004 order by allowing his daughter to travel unaccompanied to Newport News for an evaluation by Vaughan-Eden, Plaintiff specifically alleges that it was Green who directed Vaughan-Eden to ignore all collateral information and case history, provided Vaughan-Eden with false and prejudicial information about him, and allowed the mother time to "coach" his child in order to obtain a disclosure of abuse during the evaluation.  2d Am. Compl. ¶ 38, 102(g).[16]  Plaintiff also alleges that Green instructed Vaughan-Eden to question the child for the purpose of abuse by the father, but not the mother.  *Id.* at ¶ 39.[17]

Regarding the evaluation, Plaintiff alleges that Green and Vaughan-Eden pressured his daughter over the course of an hour and a half, in a way that experts have testified was traumatizing and emotionally and psychologically abusive to the child.  *Id.* at ¶ 48.  Plaintiff alleges that Defendants knew or should have known that the disclosure was extracted through a process so coercive and abusive that it would have yielded false information.  *Id.* at ¶ 49.  According to Plaintiff, Green deliberately failed to record the evaluation, and then destroyed all of her original notes from the sessions with his child in a deliberate attempt to prevent him and the state court from examining or assessing the legitimacy of those sessions.  *Id.* at ¶¶ 52, 53.

Later, while Plaintiff alleges that the Defendants collectively ignored evidence of his innocence, he alleges that it was Green who specifically aided the mother's efforts to disrupt the child's therapeutic relationship with a court-appointed therapist in early 2006.[18]  Similarly,

---

[16] According to Plaintiff, Green testified that she was aware of the falsity of some of the information the mother had provided Vaughan-Eden at the outset of his daughter's evaluation.  *Id.* at ¶ 102(e).

[17] According to Plaintiff, Vaughan-Eden testified on several occasions that she did not begin the evaluation from a neutral viewpoint, but assumed that the mother was the "non-offending parent" and the father was the "offending party."  *Id.* at ¶ 39.

[18] Plaintiff alleges that, after several therapeutic sessions with the child, the court-appointed therapist (Emily Blankenship) at that time began to conclude that the child had not been abused by Plaintiff, and reported this

Plaintiff specifically alleges that, upon learning that he had passed an Abel Assessment of Sexual Interest exam conducted by Defendants' own expert, it was Green who contacted that expert to object to the expert's involvement in the case. *Id.* at ¶ 102(s). In sum, I find that Plaintiff has alleged that Green violated his substantive due process rights in this case.

Still, for Plaintiff to sufficiently state a § 1983 claim against Green, she must have been the proximate cause of the infringement on his liberty interest. In *Evans v. Chalmers*, 703 F.3d 636 (4th Cir. 2012), the Fourth Circuit held that the district court should have granted defendants' motion to dismiss, since the plaintiffs' § 1983 complaint did not allege that the police officers misled or unduly pressured the prosecutor, and therefore the prosecutor's actions in seeking an indictment broke the causal chain for a constitutional tort. *Id.* at 649 ("[A] prosecutor's independent decision to seek an indictment breaks the causal chain unless the officer has misled or unduly pressured the prosecutor."). Defendants argue that even if there was some type of infringement on Plaintiff's liberty interest, that infringement was not proximately caused by Green (or any other defendant), but instead by independent decision makers—the assistant county attorney (Herrick) that prosecuted the case, and the state courts that entered protective orders restricting Plaintiff's visitation rights.

Plaintiff attempts to distinguish *Evans v. Chalmers* on two fronts: (1) *Evans* involved a prosecutor with independent discretion whether to initiate a prosecution,[19] and (2) there was no fraud that was perpetrated by the defendants in that case. *See id.* at 649 ("Because the Evans plaintiffs do not allege that Officers Gottlieb and Himan either misled or pressured Nifong to

---

conclusion to the mother. According to Plaintiff, the mother then began surreptitiously audio-taping conversations with that therapist, in an effort to discredit her and end the therapeutic relationship. Plaintiff alleges that Green concealed the mother's violation from the therapist and the J&DR Court. After the court-appointed therapist resigned, Plaintiff alleges that Green intervened to persuade prosecutors to overlook the mother's misconduct. *Id.* at ¶ 102(n).

[19] *See Evans*, 703 F.3d at 648 n.4 ("In North Carolina, state district attorneys, like Nifong, have the sole discretion whether to prosecute.") (citations omitted).

seek their indictments, we reverse the district court's denial of the officers' motions to dismiss the Evans plaintiffs' § 1983 malicious prosecution claims against them.").   First, in this case, Plaintiff contends that the decision whether to initiate a child-abuse petition was squarely within the decision-making capacity of the ACDSS Defendants.   In other words, according to Plaintiff, Herrick lacked independent discretion to initiate the February 2005 petition.   And second, according to Plaintiff, unlike the police officers in *Evans*, Green engaged in a variety of fraudulent actions to generate false evidence to support the February 2005 child-abuse petition.

The Fourth Circuit stated in *Evans* that "even when . . . a prosecutor retains all discretion to seek an indictment," police officers still may be liable "when they have lied to or misled the prosecutor, failed to disclose exculpatory evidence to the prosecutor, or unduly pressured the prosecutor to seek the indictment." *Id.* at 647–48 (internal citations omitted).   However, the court noted that the plaintiffs in that case did not allege that the officers misled or misinformed the state's attorney in any way: "Indeed, the Evans plaintiffs expressly allege that, from the outset, the officers candidly briefed Nifong as to the startling weaknesses in the case[.]" *Id.* at 648.   In this case, Plaintiff alleges that Green, among other actions, violated a state court order without its knowledge; destroyed her notes from Vaughan-Eden's "tainted" evaluation; destroyed investigative records from Plaintiff's case file; and ignored and concealed evidence of his actual innocence.   Plaintiff contends that these actions, taken together, misled Herrick's prosecutorial efforts and vitiated the independence of the state courts that continued the protective order in this case.

Whether those court orders, rather than Green's alleged misconduct, were in fact the cause of Plaintiff's liberty interest violation remains the issue here.   The Fourth Circuit stated in *Washington v. Wilmore*, 407 F.3d 274 (4th Cir. 2005), that the proper inquiry regarding

17

causation for the alleged § 1983 violation in that case was "whether [Plaintiff's] conviction was a reasonably foreseeable result of [the officer's] initial act of fabrication . . . ." *Id.* at 283 (citation omitted). In *Washington*, the plaintiff had been convicted in a criminal matter due largely to a leading question presented to him regarding a critical detail from the crime scene, and an officer's subsequent misrepresentation to the prosecutor that the plaintiff had volunteered that detail. *Id.* at 276–77. After his exoneration, the plaintiff brought a § 1983 claim against the city and the police officer. The court held that the question of causation was a factual issue, whose basis would have to be developed during discovery. *Id.* at 283.

As Defendants point out, the *Washington* court relied on a causation standard similar to the one used by the Second Circuit in *Zahrey v. Coffey*, 221 F.3d 342 (2d Cir. 2000), which the *Washington* court cited in support of its finding that Washington's factual allegations amounted the violation of a constitutional right. *See* 407 F.3d at 282. Later, the *Evans* court declined to use the "reasonable foreseeability" standard from *Zahrey* to "preserve the causal chain between a police officer's actions and an unlawful seizure by way of indictment." *Evans*, 407 F.3d at 649 n.5 (citing *Zahrey*, 221 F.3d at 351–52). The court noted that "no other court has pursued this suggestion and more recently the Second Circuit itself has stepped back from that broad dicta." *Id.* (citing *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007)).

That discussion in *Evans* appears to be specific to the law enforcement context described above.[20] On the other hand, in *Gedrich*, the district court held that a CPS caseworker's alleged conduct (putting a "no parental contact" restriction in place despite having no reason to believe that the child was sexually abused), if proven, violated the child's right to be free of an

---

[20] "*Zahrey* involved 'the unusual circumstance that the same person took both the initial act of alleged misconduct and the subsequent intervening act,' so that the case could be decided '[h]owever the causation issue is to be resolved in the law enforcement context in cases where an initial act of misconduct is followed by the act of a third person.'" *Wray*, 490 F.3d at 195 (quoting *Zahrey*, 221 F.3d at 352).

unreasonable seizure.  282 F. Supp. 2d at 469 ("[Defendant] set in motion a series of events that she knew or reasonably should have known would cause [the children's shelter] to deprive [plaintiff] of her constitutional rights.").  *See also Morris v. Dearborne*, 181 F.3d 657, 672 (5th Cir. 1999) ("[T]he requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights."))[21]  In any case, Plaintiff's allegations in this case track the distinguishing circumstances noted by the Second Circuit in *Wray* (and the Fourth Circuit in *Evans*), "in which the defendant misled or coerced the intervening decision-maker such that the decision-maker's conduct [*i.e.*, a court order] was tainted[.]"  *Wray*, 490 F.3d at 195.  Again, Plaintiff contends that Green's actions, taken together, had the effect of misleading Herrick and compromising the independence of the state courts that entered final orders in this case.  I find that Plaintiff has distinguished his case from *Evans*, and has stated a claim for a constitutional tort against Green.

i.    Green's Claim for Qualified Immunity

Green contends that any of her actions deemed to be administrative or investigative in this case, arising to the level of a constitutional claim, are nonetheless protected by qualified immunity.  Social services officials engaged in child abuse investigations "may properly assert qualified immunity in appropriate situations."  *Hodge*, 31 F.3d at 162 (citations omitted).  When a government official asserts qualified immunity, the court must determine: (1) whether the facts alleged show that his or her actions violated a constitutional right, and (2) whether the right

---

[21] The Fifth Circuit in *Dearborne* found that the teacher defendant "created false evidence that was presented to the state court judge and to child welfare officials in the first instance," and remanded the case so that the "fact finder will . . . be able to determine the extent to which the welfare officials and the state court judge relied on [the defendant's] representations and the extent to which she succeeded in her attempt to skew the proceedings."  *Id.* at 673.

asserted was clearly established at the time of the challenged actions. *Henry v. Purnell*, 501 F.3d 374, 377 (4th Cir. 2007) (citing *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001)).[22]

Both questions must be answered in the affirmative to defeat a claim of qualified immunity.[23]  Plaintiff bears the burden of proof on the first question of whether a constitutional violation occurred.  *Henry*, 501 F.3d at 374 (citations omitted).  Green bears the burden of proof on the second question of whether that right was clearly established at the time of the alleged violation.  *Id.* (citing *Wilson v. Kittoe*, 337 F.3d 392, 397 (4th Cir. 2003) ("The burden of proof and persuasion with respect to a claim of qualified immunity is on the defendant official.")).  A right is "clearly established" if "contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Francis v. Giacomelli*, 588 F.3d 186, 196 (4th Cir. 2009) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Ultimately, the doctrine is designed to protect against liability for "bad guesses in gray areas." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992).  If there is a "legitimate question" whether the conduct violates a plaintiff's rights, qualified immunity bars suit.  *Martin*, 346 F.3d at 505–06.

Plaintiff alleges that this case represents Green's deliberate and systematic campaign to deprive him of a parental relationship with his child.  According to Plaintiff, Green intentionally violated a state court order, and assisted in coercing a false allegation of abuse from his then-four year old daughter to support the visitation restrictions in this case.  Later, from July 2006 until September 2009, Plaintiff alleges that Green's campaign continued, and admittedly so, without any legal authority or basis.  Throughout, Plaintiff alleges that Green ignored mounting evidence

---

[22] Courts may exercise discretion in deciding which of the two *Saucier* prongs "should be addressed first in light of the circumstances in the particular case at hand."  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

[23] Because Plaintiff has failed to state a constitutional claim against the remaining ACDSS Defendants, they are entitled to qualified immunity.  *See Martin v. St. Mary's Dep't of Soc. Servs.*, 346 F.3d 502, 507 (4th Cir. 2003).

pertaining to his innocence (dating back to 2003-04), and actively opposed his attempts to bring it to light. *Cf. Prescott v. Wade*, 2013 WL 1352168, at *10 (E.D. Va. April 12, 2013) ("Plaintiffs do not set forth facts supporting their accusations that [the CPS investigator] either possessed or withheld exculpatory information.") (holding defendants entitled to qualified immunity).

As discussed, I find that this case represents one of "those instances where [a] state official's actions were directly aimed at the parent-child relationship," *Hodge*, 31 F.3d at 163 (citation omitted), and Plaintiff's allegations against Green rise to the level of an actionable violation of the familial right to privacy. That leaves me with the question of whether this right was clearly established at the time of the alleged violation.

A right is clearly established when it has been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state in which the action arose. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 251 (4th Cir. 1999). The Fourth Circuit has taken a narrow view of when a right is clearly established. While the relevant, dispositive inquiry is whether it would be clear to a reasonable person that his or her conduct was unlawful in that situation, *see Saucier*, 533 U.S. at 195, "the protection of qualified immunity is extended to acts that could not possibly have been done in good faith." John C. Jeffries, Jr., *The Liability Rule for Constitutional Torts*, 99 Virginia Law Review 207, 258 (2013) (citing *Fields v. Porter*, 566 F.3d 381 (4th Cir. 2009) (as alleged) and *Robles v. Prince George's County*, 302 F.3d 262 (4th Cir. 2002) (as proved) as illustrations).[24]

---

[24] In *Fields*, the Fourth Circuit held that defendants had violated plaintiff's First Amendment rights because they had considered her political affiliation in declining to appoint her director of a county department of social services. 566 F.3d at 389. The court relied on *McConnell v. Adams*, 829 F.2d 1310 (4th Cir. 1987), which held that the First Amendment prohibited Virginia electoral boards from considering political affiliation in filling county registrar positions. *Id.* at 390 (citing *McConnell*, 829 F.2d at 1324). Finding that the cases were factually similar, the court still concluded that the defendants were entitled to qualified immunity. *Id.* ("[W]e do not think that *McConnell* would have *clearly* put defendants on notice that their conduct was unconstitutional.") (emphasis in original).

Regarding Plaintiff's claim in this case, the Fourth Circuit has noted that the boundaries between the right to familial privacy and legitimate government interests remain "amorphous." *Hodge*, 31 F.3d at 163–64; *see also Martin*, 346 F.3d at 507 ("[T]he contours of the right to familial integrity may not be sufficiently clear in certain situations, to be deemed clearly established as required.") (citations and internal quotations omitted).  Granted, "[i]n determining whether the specific right allegedly violated was 'clearly established,' the proper focus is not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged."  *Wiley v. Doory*, 14 F.3d 993, 995 (4th Cir. 1994) (quoting *Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir. 1992)).  Still, Plaintiff has not cited a case in the Fourth Circuit, and I have found none, where a parent has successfully brought a § 1983 claim based upon his or her familial privacy rights—let alone a claim based on visitation, rather than custody.[25]

While I have found that Green's alleged conduct in this case rose to a substantive due process violation of Plaintiff's parental rights, I do not find that this liberty interest was clearly established at the time of her alleged actions here in the Fourth Circuit.  Accordingly, I will grant Green (along with the rest of the ACDSS Defendants) qualified immunity as to Plaintiff's

---

[25] In *Martin*, Judge Traxler noted in dissent that finding a right to be clearly established "does not mean that 'the exact conduct at issue [must] . . . have been held unlawful[.]'"  345 F.3d at 513 (Traxler, J., dissenting) (quoting *Amaechi v. West*, 237 F.3d 356, 362 (4th Cir. 2001)).  Rather, a court "must take into consideration 'not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked.'"  *Id.* (quoting *Amaechi*, 237 F.3d at 362–63).  Judge Traxler found that the removal of a child from his parents without prior judicial approval in a non-emergency, and where there is no evidence of serious danger, amounts to a violation of a clearly established substantive due process right.  *Id.* at 514 (citing *Weller* and *White by White v. Chambliss*, 112 F.3d 735 (4th Cir. 1997), both of which reviewed the removal effected by a caseworker who was provided evidence of child abuse).  The *Martin* majority, on the other hand, found that plaintiff had failed to state a constitutional claim.  *Id.* at 507.  Regardless, *Martin*, *Weller*, and *Chambliss* all featured parents with custody, which was the basis of their § 1983 claim.  Here, Plaintiff's constitutional claim stems from his visitation rights.  Again, Plaintiff has not cited a case in the Fourth Circuit, and I have found none, where a parent has successfully brought familial privacy claim based on those lesser rights.

constitutional claims (Counts I, II, and III) in this case.[26]  Similarly, Vaughan-Eden, acting as a government official,[27] is entitled to qualified immunity as to Plaintiff's constitutional claims against her (Counts I and II) as well.

### ii.    Supplemental Jurisdiction

At this point, only Plaintiff's state law claims remain.  The doctrine of supplemental jurisdiction indicates that federal courts generally have discretion to retain or dismiss state law claims when the federal basis for an action drops away.  *Shanaghan v. Cahill*, 58 F.3d 106, 109 (4th Cir. 1995) (citing 28 U.S.C. § 1367).  District courts "enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished."  *Id.* at 110 (citing *Noble v. White*, 996 F.2d 797, 799 (5th Cir. 1993)).  "[A] federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).

This case has been in federal court since December 2006.  Proceedings in state court date back to 2005, and after a thirteen day trial in August 2009 did not fully culminate until earlier this year.  The conclusion of those state court proceedings led this court to lift the stay that had been in place since August 2007.  Since then, Plaintiff filed a Second Amended Complaint, and

---

[26] Plaintiff notes that under *In re Allen*, 106 F.3d 582 (4th Cir. 1997), the Fourth Circuit held that "an official who performs an act clearly established to be beyond the scope of his discretionary authority is not entitled to claim qualified immunity under § 1983."  *Id.* at 593.  That case featured the Attorney General of West Virginia, who had allegedly directed that a fictitious entity be incorporated in order to prevent an out-of-state organization from incorporating under the same name.  Looking to state statutory provisions, the court concluded that the defendant could not have reasonably considered his actions to fall within his carefully circumscribed authority.  The court found that, in doing so, he was acting not as the Attorney General, but as a private individual.  *Id.* at 598.  Ultimately, *Allen* is inapplicable because, even after the State DSS's July 2006 ruling, I find that these Defendants were at all times acting as state officials in this case.

[27] The parties agree that Vaughan-Eden was retained by the ACDSS Defendants to perform the evaluation of Plaintiff's child, and in that capacity worked as a state actor.  *See* Vaughan-Eden's Mem. in Supp. of Mot. to Dismiss 1 (docket no. 126); Pl.'s Opp. to Vaughan-Eden's Mem. in Supp. 3 (docket no. 128).

the parties have extensively briefed the facts and legal issues covering Plaintiff's federal and state law claims in this case. The June 2013 hearing on the pending motions similarly featured arguments on both the federal and state law claims in this case. There is no open case in state court at this time, and I will exercise my discretion to retain jurisdiction over the following pendent state law claims.

### B.  Count IV: Malicious Prosecution

Plaintiff contends that his Second Amended Complaint states a valid claim for malicious prosecution due to his allegation that Defendants instituted and continued a case against him based on charges of sexual abuse that were not supported by probable cause. *See* 2d Am. Compl. ¶ 126. In order to establish a case for malicious prosecution, a plaintiff must show that "the prosecution was (1) malicious, (2) instituted by or with the cooperation of the [defendant], (3) without probable cause, and (4) terminated in a manner not unfavorable to [plaintiff]." *O'Connor v. Tice*, 281 Va. 1, 7, 704 S.E.2d 572, 575 (2011). Given that this claim stems from civil proceedings, Plaintiff must also allege some sort of "special loss or unusual hardship resulting from the malicious prosecution of the original action[.]" *Ayyildiz v. Kidd*, 220 Va. 1080, 1084, 266 S.E.2d 108, 111 (1980).

Regarding the first and third elements, which appear to be in dispute in this case, "legal malice may be inferred by the jury for want of probable cause." *Lee v. Southland Corp.*, 219 Va. 23, 27, 244 S.E.2d 756, 759 (1978). I find that Plaintiff's allegations leading up to and during Vaughan-Eden's "tainted" evaluation, together with Defendants' alleged actions that followed— notably, initiating a legal process based upon allegations that they knew to be false or unreliable, maintaining a petition in state court after the State DSS determined the finding of abuse to be unfounded, and actively opposing Plaintiff's proffers of evidence to rebut those allegations—are

sufficient to establish that Defendants lacked probable cause in this case.  As a result, I find that Plaintiff has sufficiently alleged malice as well.  *See, e.g.*, *Johnson v. Moore*, 2010 WL 4860348, at *3 (E.D. Va. Nov. 22, 2010) ("Plaintiff pled sufficient facts to plausibly allege malice because Plaintiff alleged an absence of probable cause, from which malice may be inferred.").

Regarding the special injury requirement under *Ayyildiz*, Plaintiff alleges that Defendants nearly ruined his professional career, and caused him to incur over a million dollars in attorney fees and litigation costs.[28]  2d Am. Compl. ¶ 106.  However, in *Ayyildiz*, a malpractice action, the Virginia Supreme Court held that loss of reputation, attorney's fees, and present and future income do not qualify as special injuries, because such consequences are faced by most individuals forced to defend themselves.  *Ayyildiz*, 220 Va. at 1084–85.  *See also Prescott*, 2013 WL 1352168, at *15 (holding that plaintiffs' complaint stating "that they have lost their reputations, opportunities for career advancement, and significant money defending themselves against the [CPS] neglect investigation" does not state a special injury.).  Plaintiff also alleges that Defendants' actions deprived him of four and a half years of his daughter's life, which continues to have an impact on his relationship with her.  2d Am. Compl. ¶ 106.  Again, I find that these allegations reflect the kind of secondary consequences associated with a child abuse petition, however meritless, rather than some type of special loss or unusual hardship.  Plaintiff also alleges that Defendants caused him to incur roughly $100,000 in therapy bills to deal with the post-traumatic stress disorder their actions have caused.  *Id.*  However, special injury, as applied in its "restricted sense" by Virginia courts, "focuses upon the intention of the defendant in the prosecution of the original case rather than upon the special circumstances of the plaintiff."

---

[28] Again, a special injury is a "special loss or unusual hardship that would not usually occur as the result of the type of prosecution at issue." *Parker v. Albemarle Cnty. Public Schools*, 2009 WL 29501, at *5 (W.D. Va. Jan. 5, 2009) (citing *Ayyildiz*, 220 Va. at 1083).

220 Va. at 1085, 266 S.E.2d at 112 (citation omitted).[29]  Because Plaintiff has failed to allege a special injury in this case, his claim for malicious prosecution fails.

### C.  Count V: Intentional Infliction of Emotional Distress

Plaintiff alleges that Defendants' conduct, as set forth in his complaint, caused him severe emotional distress that continues to this day.  The IIED tort requires a plaintiff to prove four elements: (1) the wrongdoer's conduct was intentional or reckless; (2) the conduct was outrageous and intolerable; (3) there was a causal connection between the wrongdoer's conduct and the emotional distress; and (4) the emotional distress was severe.  *Harris v. Kreutzer*, 271 Va. 188, 204, 624 S.E.2d 24, 33 (Va. 2006) (citation omitted).[30]  Virginia courts have repeatedly emphasized that the IIED tort is "not favored" in the law, given that "there are inherent problems in proving a claim alleging injury to the mind or emotions in the absence of accompanying physical injury."  *See Supervalu, Inc. v. Johnson*, 276 Va. 356, 370, 666 S.E.2d 335, 370 (2008) (citations omitted).

Defendants argue that Plaintiff has failed to set forth with sufficient specificity what form of distress he has suffered, or what treatment he has undergone, and for that reason his IIED claim must fail.  Plaintiff generally alleges "severe and prolonged" emotional distress and "severe emotional pain" on account of the Defendants' actions in this case.  Plaintiff also describes the variety of hardships and losses he has experienced due to his inability to parent his

---

[29] Plaintiff also alleges that Green admitted in state court that Defendants had no basis to continue a legal process against Plaintiff after the State DSS's decision, and that Defendants continuously opposed Plaintiff's proffers of evidence between 2006 and February 2009.  However, these allegations appear to go to Defendants' intentions, rather than another "special injury."  *See Ayyildiz*, 220 Va. at 1084, 266 S.E.2d at 112 ("[I]f one maliciously makes use of the process of law, with an intention to vex and distress another, he does it at his peril.") (citation omitted).  While I find that Plaintiff has sufficiently pleaded malice in this case, he falls short in alleging a special injury.

[30] Under Virginia law, "liability arises only when the emotional distress is extreme, and only where the distress inflicted is so severe that no reasonable person could be expected to endure it."  *Russo v. White*, 241 Va. 23, 27, 400 S.E.2d 160, 162 (1991).  Among other claims, Plaintiff alleges that Defendants violated a court order, coerced a disclosure of sexual abuse from his four year old daughter, ignored evidence that he was innocent, and disregarded an administrative finding by Defendants' state agency that Plaintiff was innocent based on their evidence.

daughter, the stigmatization of false abuse allegations, and the impact this process has had on his professional career. *See* 2d Am. Compl. ¶¶ 106, 107.

Plaintiff's IIED claim must meet the pleading standard found in the Federal Rules, rather than the heightened standard required by Virginia state courts. *See Guerrero v. Deane*, 2010 WL 670089, at *15 (E.D. Va. Feb. 19, 2010) ("[A] plaintiff before the federal court in this Circuit does not have to plead the IIED claim with the particularity required by Virginia state courts.") (citing *Hatfill v. New York Times, Co.*, 416 F.3d 320, 337 (4th Cir. 2005), *cert. denied*, 547 U.S. 1040 (2006)). In *Hatfill*, the Fourth Circuit discussed the difference between Rule 8 pleading standards and those required in Virginia state courts in the IIED context. Contrasting Hatfill's claims with those made by the unsuccessful state court plaintiff in *Russo v. White*, the court noted that "Hatfill did not allege his emotional distress in such specific terms, but Rule 8 . . . did not require him to do so." 416 F.3d at 337. Instead, Hatfill's complaint alleged "severe and ongoing loss of reputation and professional standing, loss of employment, past and ongoing financial injury, severe emotional distress and other injury." *Id.* The Fourth Circuit found that those general allegations were "sufficient under Rule 8 to give [the defendant] fair notice of what [Hatfill's] claim is and the grounds upon which it rests, and they are adequate to state the final and necessary element of a claim for intentional infliction of emotional distress." *Id.* (internal citation and quotation marks omitted).

Plaintiff noted in his opposition and during the June 2013 hearing that he was diagnosed with post-traumatic stress disorder due to the accusations of abuse and the visitation restrictions from this case, and that he underwent treatment for nearly four years. It appears that these details figure into his arguments regarding the severity of his emotional distress, but Plaintiff did not include them in his Second Amended Complaint. Matters outside of the pleadings are

generally not considered when ruling on a Rule 12 motion.  *See Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004).  Accordingly, I will grant Plaintiff leave to amend this count of his Second Amended Complaint to include these additional details.

### D.  Count VI: Loss of Parent's Companionship and Society of a Child

Plaintiff contends that the Supreme Court of Virginia has held that a single father can have a cognizable claim for tortious interference with his relationship with his child.  *See Wyatt v. McDermott*, 283 Va. 685, 725 S.E.2d 555 (2012).[31]  To state a claim for tortious interference with parental rights, a plaintiff must show:

> (1) the complaining parent has a right to establish or maintain a parental or custodial relationship with his/her minor child; (2) a party outside of the relationship between the complaining parent intentionally interfered with the complaining parent's parental or custodial relationship with his/her child by removing or detaining the child from returning to the complaining parent, without that parent's consent, or by otherwise preventing the complaining parent from exercising his/her parental or custodial rights; (3) the outside party's intentional interference caused harm to the complaining parent's parental or custodial relationship with his/her child; and (4) damages resulted from such interference.

283 Va. at 699, 725 S.E.2d at 562.

While Defendants acknowledge that *Wyatt* discussed the possibility of stating a claim for tortious interference with parental relationships, Defendants contend that the Virginia Supreme Court's holding in that case still does not support the specific duty that Plaintiff alleges in his Second Amended Complaint.  *See* 2d Am. Compl. ¶ 144 (alleging that Defendants breached their duty to "discharge their child protection responsibilities in a competent, objective, and fair manner[,]" resulting in Plaintiff's separation from his child.).  Instead, Defendants characterize

---

[31] More fully, the Virginia Supreme Court stated in *Wyatt* that, "although no Virginia court has had occasion to consider the cause of action, the tort in question has indeed existed at common law and continues to exist today. Furthermore, rejecting tortious interference with parental rights as a legitimate cause of action would leave a substantial gap in the legal protection afforded to the parent-child relationship."  283 Va. at 692, 725 S.E.2d at 558.

Plaintiff's claims as "essentially a malpractice claim against the Defendants for their actions and inactions in conducting their jobs."

The *Wyatt* suit was brought by an unwed father against an adoption agency, two attorneys, and others who had facilitated the adoption of his newborn child without his knowledge. The plaintiff sought compensatory and punitive damages against those defendants for the tortious interference with his parental rights in federal district court in Virginia. The district court denied his claim, and certified questions of law to the Virginia Supreme Court regarding whether Virginia recognizes tortious interference with parental rights as a cause of action and, if so, what elements constitute that tort. 283 Va. at 689–90, 725 S.E.2d at 556–57.

In holding that the Commonwealth recognized such a right, the Virginia Supreme Court noted that "a parent's right to raise his or her child [is] 'perhaps the oldest of the fundamental liberty interests recognized by [the U.S. Supreme] Court.'" 283 Va. at 692, 725 S.E.2d at 558 (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). The court continued: "It follows, then, that a parent has a cause of action against third parties who seek to interfere with this right." *Id.* Instead of creating a new tort, the court concluded that it was "rather recognizing that the common law right to establish and maintain a relationship with one's child necessarily implies a cause of action for interference with that right." 283 Va. at 693, 725 S.E.2d at 558–59. The types of harms contemplated by the court "[w]hen a parent has been unduly separated from a child by a third party for a substantial period of time *without due process of law*, . . . includ[e] loss of companionship, mental anguish, loss of services, and expenses incurred to recover the child." 283 Va. at 693, 725 S.E.2d at 559 (emphasis added).

While Plaintiff has stated a substantive due process claim under § 1983 against Green, Plaintiff does raise any procedural due process claims in this matter. Conversely, the plaintiff in

*Wyatt* sought compensatory and punitive damages for an unauthorized adoption, after custody had already been transferred to another family without his knowledge.  283 Va. at 690–91, 725 S.E.2d at 557.[32]  Furthermore, the discussion and holding in *Wyatt* was wholly within the context of a custody battle, rather than the adjudication of a child abuse petition.  *See* 283 Va. at 694, 725 S.E.2d at 559 ("Virginia has well-developed custody laws to manage intra-familial disputes, but custody disputes do not implicate the rights or duties of third parties, such as are at issue here.").  In fact, the Virginia Supreme Court cited the Restatement (Second) of Torts § 700 as the more modern embodiment of the ancient writ of tortious interference with parental rights, which the Court used to support its finding that that common law action is recognized in Virginia today: "One who, with knowledge that the parent does not consent, abducts or otherwise compels or induces a minor child to leave a parent legally entitled to its custody or not to return to the parent after it has been left him, is subject to liability to the parent."  283 Va. at 695, 725 S.E.2d at 560.  For the foregoing reasons, I find that this state law claim does not apply to the circumstances of this case, so far removed from the facts that informed the *Wyatt* court's discussion.[33]  Accordingly, I will grant Defendants' motion to dismiss this claim.

**b.  Motion to Dismiss by Defendant Viola Vaughan-Eden**

1. <u>Vaughan-Eden's Claim for Tort Immunity</u>[34]

As stated, Virginia's reporter immunity statute provides that social workers who have a reason to suspect that a child is abused, and who report that abuse pursuant to § 63.2-1509, "shall

---

[32] It appears that the plaintiff in *Wyatt* was not even aware that his child had been born at the time custody was transferred.  *Id.*

[33] *Wyatt* has yet to be cited by a federal district court to uphold a claim for tortious interference with parental rights.

[34] Again, because Plaintiff's right to familial privacy is not clearly established in this Circuit, I find that Vaughan-Eden is entitled to qualified immunity as to Plaintiff's constitutional claims (Counts I and II) against her.  For reasons previously discussed, Vaughan-Eden is also entitled to absolute immunity for her affidavits and testimony in state court.

be immune from any civil or criminal liability in connection therewith, unless it is proven that such person acted in bad faith or with malicious intent." Va. Code Ann. § 63.2-1512.  Here in this case, Plaintiff alleges that Vaughan-Eden did the following: (1) ignored collateral information (2d Am. Compl. ¶¶ 39–42); (2) became a partisan with one parent and her attorney (¶ 46); (3) traumatized his child in a grueling interrogation (¶¶ 48–50); (4) coerced his child into making a disclosure against her will (¶¶ 48–50); (5) refused to tape any of the sessions with his child to avoid assessment of her interviews (¶ 42); (6) destroyed her notes of the sessions after receiving a subpoena for them in the state case (¶ 42); and (7) lied to state tribunals (¶ 60). Given these allegations and others, including the allegation that Vaughan-Eden told a news reporter that Plaintiff was guilty of abuse after he had been found innocent in state court, *see id.* at ¶ 134, I find that Plaintiff has sufficiently alleged bad faith on the part of Vaughan-Eden, so as to overcome her defense under Virginia's reporter's immunity statute regarding Plaintiff's tort claims in this case.

### 2.  Plaintiff's Second Amended Complaint

#### A.  Count V: Intentional Infliction of Emotional Distress

For the reasons discussed regarding Defendants' motion to dismiss, I will grant Plaintiff leave to amend his Second Amended Complaint as to this count.

#### B.  Count VI: Loss of Companionship and Society of a Child

For the reasons discussed regarding Defendants' motion to dismiss, Plaintiff has failed to state a claim for the tortious interference of his parental rights against Vaughan-Eden.

#### C.  Count VII: Professional Negligence

Plaintiff alleges that Vaughan-Eden owed him "a specific duty to investigate him and to question his child," and "a specific duty to draw conclusions and render professional opinions

regarding him with a high degree of professional care."  2d Am. Compl.  ¶¶ 150–51.  Plaintiff

contends that Vaughan-Eden owed him these duties of care "because of the special relationship

between Vaughan-Eden and the child she was subjecting to questioning and evaluation."  *Id.* at ¶

152.  Plaintiff alleges that Vaughan-Eden negligently and in bad faith breached these duties by

"intentionally, deliberately and with malice psychologically assaulted [his] child for the purpose

of coercing her to accuse [Plaintiff]" of sexual abuse.  *Id.* at ¶ 153.  As a result of that breach,

Plaintiff alleges that he has suffered "significant expense" and "severe emotional pain and

suffering."  *Id.* at ¶ 154.

Plaintiff's negligence claim against Vaughan-Eden fails because, as a matter of law,

Vaughan-Eden did not owe Plaintiff a legal duty in this case.[35]  The Virginia Supreme Court has

consistently held that "generally a person does not have a duty to protect another from the

conduct of third persons." *Didato v. Strehler*, 262 Va. 617, 628–29, 554 S.E.2d 42, 49 (2001).

This "general rule applies unless '(a) a special relation exists between the actor and the third

person which imposes a duty upon the actor to control the third person's conduct; or (b) a special

relation exists between the actor and the other which gives to the other a right to protection.'"

*Marshall*, 239 Va. at 318, 389 S.E.2d at 904 (quoting Restatement (Second) of Torts § 315).[36]

Examples of the first exception include cases where the defendant takes custody of or exercises

control over the third party.  *See Dudley v. Offender Aid and Restoration of Richmond, Inc.*, 241

Va. 270, 276, 401 S.E.2d 878, 881 (Va. 1991) (holding that a felon placed in a halfway house for

the remainder of his sentence was in the custody of the halfway house for purposes of § 319); *cf.*

---

[35] In Virginia, a plaintiff who seeks actionable negligence must plead the existence of a legal duty, violation of that duty, and proximate causation which results in injury.  *Marshall v. Winston*, 239 Va. 315, 318, 389 S.E.2d 902, 904 (1990).

[36] The special relationship referenced in § 315(a) is detailed in § 319 of the Restatement (Second) of Torts: "Section 319 provides that '[o]ne who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.'"  *Id.* (citation and internal quotations omitted).

*Fox v. Custis*, 236 Va. 69, 75, 372 S.E.2d 373, 376 (Va. 1988) (holding that a parolee, who had been released from incarceration, was not in the custody of his parole officers for purposes of § 319).

Plaintiff cites *Kellerman v. McDonough*, 278 Va. 478, 648 S.E.2d 786 (2009), in an attempt to establish a "special relationship" between Vaughan-Eden and his daughter, such that Vaughan-Eden could be held civilly liable for the harm his daughter's false disclosure has caused him.  *See* Pl.'s Opp. to Vaughan-Eden's Mem. in Supp. 13 ("[Vaughan-Eden] through her failure to exercise reasonable care effectively converted Plaintiff's daughter into a weapon against him.").  *Kellermann* featured a parent who dropped her daughter off at a friend's house, and specifically told that friend's parents that her daughter was not to be driven by any inexperienced drivers, and in particular young males.  278 Va. at 484–85, 684 S.E.2d at 788–89.  The child was eventually killed in a car accident after being driven by a young male with a reputation for reckless driving.  278 Va. at 486, 684 S.E.2d at 790.  In the wrongful death suit that followed, the Virginia Supreme Court concluded that "when a parent relinquishes the supervision and care of a child to an adult who agrees to supervise and care for that child, the supervising adult must discharge that duty with reasonable care."  *Id.*

In so finding, the court declined to expand its "jurisprudence regarding special relationships to include an adult who agrees to supervise and provide care to a minor[,]" but instead found that the "duties that do exist in this case are a general duty of ordinary care and an assumed duty."  278 Va. at 492, 684 S.E.2d at 793.[37]  Thus, the holding of *Kellermann* is inapplicable to the instant claim, insofar as Plaintiff's theory of liability relies on establishing a special relationship between Vaughan-Eden and his daughter.  Furthermore, Vaughan-Eden

---

[37] The Virginia Supreme Court has addressed this type of assumption of duty principle in only limited situations. *See Tuel v. Hertz Equipment Rental Corp.*, 508 F. App'x 212, 217 (4th Cir. 2013) (citing *Kellermann*, 684 S.E.2d 786).

33

never personally agreed with Plaintiff before or during her evaluation of his daughter to undertake any sort of duty care.

Nor was there was there a special relationship between Vaughan-Eden and Plaintiff's daughter in this case.  Vaughan-Eden, through her evaluation, never took custody of Plaintiff's daughter, or exercised sufficient control in order to establish a special relationship with her.  *See DeShaney v. Winnebago Cnty. Dep't. of Soc. Servs.*, 489 U.S. 189, 197 (1989) (Finding no special relationship between social workers and child, even though "the State once took temporary custody of [the child.]"); *see also Waybright v. Frederick Cnty.*, 528 F.3d 199, 207 (4th Cir. 2008) (A "special relationship is all but synonymous with a custodial relationship."). While the *DeShaney* court was clear that social workers could have a duty to protect a child from private violence when they take an active role in his or her life, *see* 489 U.S. at 201, in this case it is Plaintiff who seeks to establish a legal duty of care for his alleged injuries.

In perhaps a closer analogy, the Virginia Supreme Court is clear that a doctor-patient or hospital-patient relationship, standing alone, does not constitute a special relationship nor create liability on the part of the medical care provider for the patient's actions.  *See Nasser v. Parker*, 249 Va. 172, 180, 455 S.E.2d 502, 506 (Va. 1995).  "In so ruling, the [Virginia Supreme Court] set a high hurdle and suggested some sort of custodial relationship, as would exist in a confinement setting, is required before section 319 liability can attach."  *Sage v. U.S.*, 974 F. Supp. 851, 860 (E.D. Va. 1997) (discussing *Nasser*).  Because Plaintiff has failed to establish a legal duty between him and Vaughan-Eden due to her evaluation of his daughter, or cite a Virginia statute establishing such a duty,[38] his claim for professional negligence must fail.

---

[38] Plaintiff notes that other state courts have recognized legal duties in circumstances similar to this case.  *See, e.g.*, *Montoya v. Bebensee*, 761 P.2d 285, 289 (Colo. Ct. App. 1988) ("[A] mental health care provider owes a duty to any person, who is the subject of any public report or other adverse recommendation by that provider, to use due care in formulating any opinion upon which such a report or recommendation is based."); *Hungerford v. Jones*, 143 N.H.

34

IV.    CONCLUSION

For the foregoing reasons, I grant Defendants' motion to dismiss Counts I–IV and VI of Plaintiff's Second Amended Complaint.  I also grant Vaughan-Eden's motion to dismiss Counts I, II, VI and VII of Plaintiff's Second Amended Complaint.  I grant Plaintiff leave to amend Count V of his Second Amended Complaint as to all defendants.   An appropriate order accompanies this memorandum opinion.

Entered this  15th   day of August, 2013.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE

---

208, 215, 722 A.2d 478, 482 (1998) ("The duty of care to the accused parent is breached by the therapist when the publicized misdiagnosis results from (1) use of psychological phenomena or techniques not generally accepted in the mental health community, or (2) lack of professional qualification.").  *See also Wilkinson v. Balsam*, 885 F. Supp. 651 (D. Vt. 1995) (interpreting Vermont law, holding that a psychiatrist's duty to third party father in diagnosing son's and stepson's past sexual abuse depended upon the foreseeability of harm to the third party).