**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
CHARLOTTESVILLE DIVISION

|  |  |
|---|---|
| JOHN T. NELSON,<br><br>                             *Plaintiff,*<br><br>           v.<br><br>LORI GREEN,<br>CINDY CASEY<br>JOHN FREEMAN<br>KATHY RALSTON, and<br>VIOLA VAUGHAN-EDEN,<br>                             *Defendants.* | CASE NO. 3:06-cv-00070<br><br><br>**MEMORANDUM OPINION AND ORDER**<br><br><br><br>JUDGE NORMAN K. MOON |

**I. INTRODUCTION**

This matter is before the Court on two motions to dismiss John T. Nelson's Third Amended Complaint: a motion to dismiss filed by defendants Cindy Casey, John Freeman, Lori Green, and Kathy Ralston ("ACDSS Defendants") (ACDSS Motion to Dismiss) (docket no. 144), and a motion to dismiss filed by defendant Viola Vaughan-Eden ("Vaughan-Eden") (V-E Motion to Dismiss) (docket no. 150).  John T. Nelson ("Plaintiff") filed a response in opposition to both, and Defendants and Vaughan-Eden filed replies.  This Court held a hearing on the motions on December 16, 2013.  For the reasons that follow, I will grant in part and deny in part Vaughan-Eden's Motion to Dismiss, and I will deny the ACDSS Motion to Dismiss.

**A.  Procedural History**

Plaintiff filed this action in December 2006, claiming Lori Green, Cindy Casey, John Freeman, Kathy Ralston and Viola Vaughan-Eden violated various state and federal laws in coercing Plaintiff's daughter to falsely accuse him of sexual abuse.  On August 8, 2007, the federal case was stayed until the underlying state court proceedings concluded.  On March 14,

2013, Magistrate Judge B. Waugh Crigler lifted that stay and granted Plaintiff leave to file a second amended complaint.   Plaintiff's Second Amended Complaint featured seven distinct causes of action, including both federal and state claims.   On two motions to dismiss that Second Amended Complaint, one each by the ACDSS Defendants and Vaughan-Eden, I dismissed all but Plaintiff's intentional infliction of emotional distress ("IIED") claim, Count V of that complaint, granting Plaintiff leave to amend Count V as to all defendants.   Only one state law claim remained, but I exercised my discretion to retain supplemental subject matter jurisdiction over that claim under 28 U.S.C. § 1367.   *See Nelson v. Green*, No. 3:06-cv-00070, 2013 WL 4202225, at *14–15 (W.D. Va. Aug. 15, 2013) [hereinafter "*Nelson* Opinion" or "Opinion"].

On August 29, 2013, Plaintiff filed his Third Amended Complaint (docket no. 139) (hereinafter "Complaint" or "Third Amended Complaint").   In that Complaint, Plaintiff re-alleges what was Count V of the Second Amended Complaint as Count I, "suppl[ying] additional details regarding the extent and severity of the emotional distress [he] suffered as a result of Defendants' " actions.   Plaintiff "did not repeat or re-assert the dismissed claims," he says, because those counts of the Second Amended Complaint had been dismissed by this Court without leave to amend.   Instead, Plaintiff pled in Paragraph 108 of the Third Amended Complaint as follows:

> 108. Plaintiff expressly preserves by reference his claims asserted against all Defendants in Counts I, II, III, IV, VI, and VII of his Second Amended Complaint (including his claim for attorney fees under 42 U.S.C. § 1988), which were dismissed by the Court by Order dated August 15, 2013, and reserves his right of appeal on these claims as to all Defendants upon a final order or judgment in this case.   However, those claims are not re-stated in this Third Amended Complaint under the pleading rule set forth in *Young v. City of Mount Ranier*, 238 F.3d 567, 572–73 (4th Cir. 2001).   All facts set forth in support of those claims are re-asserted in the Third Amended Complaint to preserve the factual basis for the claims and because the facts have independent bearing upon Plaintiff's claim for intentional infliction of emotional distress.

## B.  Motions to Dismiss the Third Amended Complaint

On September 30, 2013, all Defendants timely filed motions to dismiss the Third Amended Complaint, along with answers to that Complaint.  The ACDSS Motion to Dismiss argues that this Court should dismiss the Third Amended Complaint for four reasons.  First, Defendants claim this Court lacks subject matter jurisdiction over the Complaint under Federal Rule of Civil Procedure 12(b)(1) because Plaintiff does not re-plead the dismissed counts of the Second Amended Complaint, which provided the basis for this Court's supplemental jurisdiction.  Second, the ACDSS Defendants re-assert their absolute immunity for any non-administrative, non-investigative actions associated with the filing of the removal petition in state court.  Third, the ACDSS Defendants argue the Complaint fails to plead facts sufficient to exempt them from reporter immunity under Virginia Code § 63.2-1512.  Finally, the ACDSS Defendants argue Plaintiff's IIED claim must be judged under substantive Virginia law, now that he has more specifically pled it, and does not sufficiently state a plausible claim under that law.

Vaughan-Eden adopts these arguments, and separately argues the conduct the Complaint specifically attributes to her is not sufficiently outrageous and intolerable to satisfy Virginia's IIED standards.  She further alleges Virginia's immunity doctrines shield her from liability, as Plaintiff has not alleged sufficient malice or bad faith on her part.  Finally, Vaughan-Eden argues the Complaint neither states a claim for punitive damages against her specifically, nor provides any basis for the award of attorneys' fees against any of the Defendants.

Plaintiff filed a consolidated response to both motions on October 17, 2013.  In that response, among other things, Plaintiff argues that the absolute immunity this Court applied to Defendants for their actions on the federal claims does not grant them absolute immunity on the remaining state law claim.  Instead of federal immunity doctrine for § 1983 cases, Virginia's

3

immunity law applies to his IIED claim, Plaintiff avers. The ACDSS Defendants and Vaughan-Eden timely replied on October 28, 2013, disputing these assertions. In their reply, the ACDSS Defendants attempted to introduce various exhibits to supplement their motion to dismiss.

## II. BACKGROUND

This case stems from Plaintiff's allegation that four employees of the Albemarle County Department of Social Services ("ACDSS"), along with a social worker who worked at their direction, abused their official positions to coerce Plaintiff's daughter to falsely accuse her father of sexual abuse. Plaintiff filed his original complaint in December 2006, and this case was stayed until the underlying state court proceedings concluded. On January 9, 2013, the Circuit Court of Albemarle County (Higgins, J.) entered a final order, and no appeal was filed.

Plaintiff and the mother of his daughter, who is now twelve years old, were never married. Starting in 2003 and into 2004, in the midst of a custody battle, the mother began alleging that Plaintiff had sexually abused their child. Plaintiff states that the four ACDSS Defendants became aware of the case around that time, as the mother brought the child to various therapists, doctors, and emergency rooms for evaluations. Plaintiff states that several therapists reported to Green, a case worker for Child Protective Services ("CPS") (an office of ACDSS), that the mother's allegations were false, and that the mother was attempting to coach the child or manipulate the therapists into making a false finding of abuse.[1] Plaintiff states that one of those medical examinations, which took place at the U.Va. Medical Center's emergency room, prompted a report that was sent to the ACDSS Defendants about the mother's conduct.

---

[1] Defendant Lori Green served as the lead CPS case worker in the investigation and prosecution of Plaintiff's case. Defendant Cindy Casey served as Green's direct supervisor in the CPS office throughout the investigative process. According to Plaintiff, Casey possessed final authority to establish and approve the CPS's official policies and customs. Defendant Kathy Ralston served as Director of ACDSS, and in that capacity possessed final authority to establish and approve the Department's official policies and customs. Defendant John Freeman served as Assistant Director of ACDSS throughout the investigative process and, according to Plaintiff, was responsible for reviewing the findings and decisions made by Green and Casey.

In August 2004, the mother presented her allegations to Judge Berry, of the Juvenile & Domestic Relations District Court for the City of Charlottesville ("J&DR Court"). Judge Berry rejected the mother's allegations that Plaintiff had abused their child. The J&DR Court order, dated August 10, 2004, required that any future request by the mother to take the child to a therapist had to be approved by the J&DR Court's therapist, Wendy Carroll. That order also required that an ACDSS employee or designee accompany the child to any future evaluation.

The ACDSS Defendants began investigating the mother's allegations in December 2004. According to Plaintiff, the four ACDSS Defendants intentionally violated the J&DR Court's order by sending the child to be questioned by Vaughan-Eden without obtaining Wendy Carroll's prior approval. Plaintiff also states that Carroll, the child's *guardian ad litem*, had specifically objected to an evaluation by Vaughan-Eden, who is a licensed clinical social worker in private practice in Newport News, Virginia.[2] Defendants further violated Judge Berry's order by failing to accompany Plaintiff's daughter on all visits to Vaughan-Eden in Newport News. Prior to Vaughan-Eden's evaluation, Plaintiff alleges that Green provided Vaughan-Eden with false information about him, instructed her not to talk to Plaintiff, and concealed all prior professional evaluations that had concluded that the child had not been abused.

Vaughan-Eden did not videotape the back-to-back, 45-minute interviews she held with the child in February 2005, who at the time was four years old. Plaintiff alleges that Vaughan-Eden worked with Green during both sessions, and instructed his daughter to make a disclosure of abuse. Plaintiff states that in the second session, Green and Vaughan-Eden jointly pressured his daughter through leading questions to tell them "Who hurt your butt?" Plaintiff states that his daughter became "visibly anxious" during the sessions, "bounc[ed] off the walls and the floor,"

---

[2] Plaintiff alleges that Vaughan-Eden was first identified by the mother's attorney, who had a close working relationship with Vaughan-Eden, and that Vaughan-Eden earned fees from that referral. 3d Am. Compl. ¶ 26.

and "made animal calls and cried out" before eventually saying "Daddy."  3d Am. Compl. ¶ 47.
Plaintiff states that experts in the state case testified that these sessions were traumatizing and
emotionally and psychologically abusive to the child.  Plaintiff alleges that Vaughan-Eden's
evaluation was corrupt, and was set up for the purpose of manufacturing a false disclosure of
abuse.  Vaughan-Eden's report implicated Plaintiff in sexually abusing his daughter.

The four ACDSS Defendants used that report to support a petition for a protective order
in the J&DR Court of Albemarle County later that month.  Plaintiff alleges Green and Vaughan-
Eden executed an affidavit that misrepresented what his daughter had said, and omitted crucial
facts pertaining to Vaughan-Eden's evaluation.  Allegedly, Green and Vaughan-Eden continued
those misrepresentations through their testimony before the J&DR Court.  After multiple
hearings, the J&DR Court found that the child had been abused, but could not determine which
parent was responsible.  The J&DR Court found that the child's disclosure was "tainted" by the
procedures Green and Vaughan-Eden employed, and was therefore too unreliable to establish a
finding of abuse by the father.  The Court issued a final protective order in April 2005 naming
both the Plaintiff and the mother as respondents.[3]

Before the J&DR Court issued its final order, the ACDSS Defendants pursued an
administrative action against Plaintiff resulting in a Level 1 "founded" disposition, indicating
Plaintiff had sexually abused his child.  As a result of that disposition, Plaintiff's name was
placed on a central registry of child sex abusers.  The disposition was also used to restrict
Plaintiff's visitation with his daughter to no more than three hours per week, with adult
supervision.[4]  Plaintiff appealed the Level 1 administrative finding to the State DSS.  In July

---

[3] The J&DR Court entered a preliminary protective order following Defendants' February 2005 petition.  In March 2005, the J&DR Court held an adjudicatory hearing, and then entered a further protective order in April 2005.

[4] The weekly three-hour restriction remained in place from February 2005 until September 2009.

2006, a hearing officer overturned the Level 1 "founded" disposition against Plaintiff. According to the State DSS, the Defendants' agency "did not even come close to proving its case by a preponderance of the evidence."  3d Am. Compl. ¶ 69.

However, Defendants did not dismiss their abuse allegations or revise their visitation restrictions following that ruling, so proceedings in state court continued.  Those proceedings culminated in a thirteen-day trial in Albemarle Circuit Court in August 2009.  Following the conclusion of that trial, the Circuit Court held in September 2009 that (1) the father did not abuse the child in any manner, and (2) the mother had engaged in a pattern of interference in the father's relationship with the child, but did not abuse the child.  The Circuit Court also enjoined the mother from interfering further in the child's relationship with the father.  The mother appealed, and the Court of Appeals issued a decision on January 11, 2011, reversing certain evidentiary rulings from the trial, as well as the definition of "abuse" as applied to the mother's conduct.  Finally, on January 9, 2013, the Circuit Court reaffirmed its September 16, 2009 order, including its previous findings that (1) the father did not abuse the child in any manner, and (2) the mother engaged in a pattern of interference in the father's relationship with the child.  The Circuit Court also implemented an injunction against the mother prohibiting any further interference in the child's relationship with the father.  The Circuit Court also held that Judge Berry's initial August 2004 order, from the Charlottesville J&DR Court, was to remain in effect.

Here in federal court, Judge Crigler lifted the stay in March of 2013 and granted Plaintiff leave to file a second amended complaint.  After Defendants' and Vaughan-Edens' motions to dismiss, this Court dismissed all but Count V of the Second Amended Complaint.  Defendants and Vaughan-Eden now challenge the Third Amended Complaint on motions to dismiss.

### III. Legal Standard

In order to survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must contain facts sufficient "to raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). A claim is plausible if the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," and if there is "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When considering a Rule 12(b)(6) motion, a court must accept all factual allegations in the complaint as true, and must draw all reasonable inferences in favor of the plaintiff. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). However, a court is not required to "accept the legal conclusions drawn from the facts" or "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Eastern Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000) (citations omitted).

### IV. Discussion

#### A. The ACDSS Defendants' Motion to Dismiss

The ACDSS Defendants repeat several of the claims this Court rejected in the *Nelson* Opinion and present new arguments regarding what Plaintiff must now prove to plead a plausible claim for IIED. In response, Plaintiff presents a novel issue: whether Virginia's immunity doctrines now entirely govern the IIED claim, such that the Defendants' and Vaughan-Eden's prosecutorial actions in state court and in filing the removal petition are again placed at issue.

##### *1. Subject Matter Jurisdiction under Rule 12(b)(1)*

In the *Nelson* Opinion, I stated I would "exercise my discretion to retain jurisdiction" over pendent state law claims, including the IIED claim. *See Nelson v. Green*, No. 3:06-cv-

00070, 2013 WL 4202225, at *13 (W.D. Va. Aug. 15, 2013). The Third Amended Complaint cites this decision and asserts that "[t]his Court has jurisdiction over tort claims arising under state law pursuant to 28 U.S.C. § 1367(a) because the claims are so related to the federal constitutional claims they form part of the same case or controversy." 3d Am. Compl. ¶ 9. The Complaint also notes this case "as presented in the Second Amended Complaint" arose under federal question jurisdiction, pursuant to 28 U.S.C. §§ 1331 and 1334(a)(3). *Id.* at ¶ 8. Plaintiff clarifies in Paragraph 108 that he does not restate his dismissed claims in this Complaint, but "expressly preserves" the claims and reserves the right to appeal their dismissal. *Id.* at ¶ 108 (citing *Young v. City of Mount Ranier*, 238 F.3d 567, 572–73 (4th Cir. 2001)).

Defendants argue Plaintiff has pled himself out of subject matter jurisdiction. Defendants observe Plaintiff does not restate, incorporate, or adopt his dismissed federal question claims in this Complaint. Defendants assert that "courts look to the amended complaint to determine jurisdiction," and that "[t]he original complaint, once superseded, cannot be utilized to cure defects in the amended pleading *unless the relevant portion is incorporated into the new pleading*." ACDSS Mot. to Dismiss 2 (emphasis in original) (citing *Wellness Cmty. Nat'l v. Wellness House*, 70 F.3d 46, 49 (7th Cir. 1995)).

Defendants' authority deals only with a plaintiff *voluntarily* choosing to dismiss the federal portions of a complaint and then seeking to proceed solely on state law claims under supplemental jurisdiction. Under those circumstances in *Wellness*, the Seventh Circuit found a district court no longer maintains subject matter jurisdiction unless the plaintiff re-pleads the federal claims. *See Wellness*, 70 F.3d at 48–49. But where plaintiffs amend complaints after *involuntary* dismissal of federal claims, as on motions to dismiss, at least two federal courts have found plaintiffs need not re-plead the dismissed claims to secure subject matter jurisdiction.

The Eleventh Circuit, in an unpublished opinion, vacated a district court's dismissal of a complaint in almost exactly the situation this Court faces.   *See Bayshore Ford Trucks Sales, Inc. v. Ford Motor Co.*, 299 F. App'x 943, 944 (11th Cir. 2008) (unpublished). The court reasoned:

> We see no difference in the instant scenario than a scenario in which the plaintiff's complaint contains one federal claim and one state law claim within the court's supplemental jurisdiction, and the court dismisses the federal claim under Fed. R. Civ. P. 12(b)(6), (c), or 56 and then decides, in the exercise of the discretion § 1367 affords it, to litigate the state law claim to judgment. We could not say that the court lost its subject matter jurisdiction once it dismissed the federal claim. *Take the scenario one step further and suppose that the court, after announcing that it was retaining jurisdiction, allows the plaintiff to amend its complaint to restate the state law claim. Would this destroy the court's jurisdiction? We think not.* That is, in effect, what occurred here . . . plaintiffs amended their complaint, reasserting their state law claims, after the court dismissed involuntarily one of their federal statutory claims.
>
> * * * *
>
> The district court properly exercised its supplemental jurisdiction after involuntarily dismissing plaintiffs' claims under the Automobile Dealers' Day in Court Act. The fact that plaintiffs['] amended complaint did not contain their Robinson-Patman Act claims did not oust the court of supplemental jurisdiction.

*Id.* (emphasis added). *See also Seekamp v. It's Huge, Inc.,* No. 1:09-CV-0018 (LEK/CFH), 2013 WL 2486912, at *1–2 (N.D.N.Y. June 10, 2013) (citing *Bayshore*, 299 F. App'x at 944) (same); *cf. Young v. City of Mount Ranier*, 238 F.3d 567, 572–73 (4th Cir. 2001) (holding the appellate waiver rule does not apply to "claims not included in the amended complaint [that] have previously been dismissed by the court without leave to amend").

Plaintiff makes the more convincing argument.  This Court opted to retain supplemental jurisdiction and allowed Plaintiff to re-plead only a state law claim.  It defies logic that this Court would waste the parties' time and effort in allowing such an amendment, just to pull the rug out from underneath Plaintiff upon its completion.  Neither will this Court require Plaintiff to clutter

his amended complaint and the entire subsequent judicial process by re-pleading, adopting, or incorporating dismissed claims.  As this Court clearly stated in the *Nelson* Opinion, it retains supplemental jurisdiction over Plaintiff's IIED claim.  Plaintiff need not re-plead dismissed federal claims to make this Court's retention of subject matter jurisdiction a reality.

### 2.  **Vosburg** *Absolute Immunity and State Law Claims*

Defendants assert that "[u]nder Virginia law, social workers are entitled to absolute immunity for the prosecutorial acts of preparing and filing removal petitions."  ACDSS Mot. to Dismiss 3 (quoting *Nelson*, 2013 WL 4202225, at *4).  Therefore, Defendants argue Plaintiff's IIED claim can only rely on those actions "performed in an investigative or non-prosecutorial[,] administrative" manner "predating the February 9, 2005 Petition filed by the Albemarle County Attorney on behalf of ACDSS."[5]  *Id.*  Plaintiff counters that the *Nelson* Opinion, and *Vosburg v. Department of Social Services*, 884 F.2d 133, 137 (4th Cir. 1989), on which this Court relied, only granted social workers immunity in the context of a federal § 1983 claim in federal court.  For Plaintiff's IIED state law claim, Plaintiff argues choice of law principles dictate that Virginia's law of immunity should apply.  Plaintiff is correct, and this Court has and will apply state law immunity to Plaintiff's IIED claim.

Defendants correctly quote the *Nelson* Opinion in its statement of the legal standard for *Vosburg* absolute immunity to § 1983 claims.  However, examining the *Nelson* Opinion shows this Court referred to Virginia law only to explain that the nature of Virginia's judicial process, in this case as in *Vosburg*, means that filing a removal petition places a social worker in a

---

[5] Aside from whether *Vosburg* immunity applies to Plaintiff's state law claim, this Court did not define that immunity as broadly as the ACDSS Defendants suggest.  Although they are immune for their actions in state court and elsewhere related to the prosecutorial function of filing and maintaining the removal petition, they are not absolutely immune for all actions taken after the filing of that removal petition.  Any non-prosecutorial actions that were investigative or administrative, taken after the filing of the February 9, 2005 removal petition, are not included in their *Vosburg* immunity.

prosecutorial role, triggering federal common law immunity to § 1983 claims.  *Nelson*, 2013 WL 4202225, at *4 (quoting *Vosburg*, 884 F.2d at 137).   The *Nelson* Opinion went on to state:

> Defendants are entitled to the same absolute immunity for filing the February 2005 petition in this case.
>
> \* \* \* \*
>
> I will not award absolute immunity to any of the ACDSS Defendants for their investigative or non-prosecutorial administrative actions predating the February 2005 petition.
>
> \* \* \* \*
>
> Once again, I find that Defendants are absolutely immune in this case for their actions in state court, including filing the February 2005 petition and offering their testimony in subsequent proceedings.
> [H]ere in the Fourth Circuit, immunity from liability extends to social workers for the preparation and filing of a removal petition, even if false statements are submitted in support of removal . . . [a]ccordingly, Green and the rest of the Defendants are absolutely immune for any misstatements contained in their affidavits, along with their subsequent testimony in state court.

*Id.*  at *4, 5, 5 n.9, 6.

In their reply, Defendants cite this language in the *Nelson* Opinion, along with holdings in a related case, *Nelson v. Herrick*, No. 3:11-cv-00014, 2011 WL 5075649 (W.D. Va. Oct. 26, 2011), to argue this Court intentionally and properly applied *Vosburg* immunity to Plaintiff's IIED claim.   Defendants argue *Vosburg* and U.S. Supreme Court cases on this issue do not derive immunity from a "federal common law" solely applicable to § 1983 cases, but provide immunity available "as an extension of the common law rule."  ACDSS Mot. to Dismiss 7.  Yet, *Vosburg* only applied absolute prosecutorial immunity to Virginia social workers for *federal* claims – no state claims were at issue.  *See Vosburg*, 884 F.2d 133.

Defendants also cite the similar case of *Nelson v. Herrick*, No. 3:11-cv-00014, 2011 WL 5075649, at *4 (W.D. Va. Oct. 26, 2011), and observe that this Court found  the state prosecutor who represented the Department of Social Services ("DSS") was absolutely immune, dismissing

this same Plaintiff's IIED claim against him.  In doing so, this Court declined to consider other potential grounds for dismissal of the IIED claim and other state claims "[b]ecause [it found] that Herrick is entitled to absolute immunity."  *Id.*  Defendants argue this Court has therefore already applied *Vosburg* immunity to Plaintiff's state claims.

Although this Court discussed *Vosburg* and federal common law prosecutorial immunity in *Herrick*, its findings were tailored to the arguments the parties made before it.  Plaintiff in *Herrick* apparently never argued that *Vosburg* immunity should not apply to his IIED claim against *Herrick*, and this Court instead analyzed whether his actions were non-prosecutorial under federal precedents, as Plaintiff argued.

> I first note that *Shirley* and similar cases make it clear that Herrick, while not a 'prosecutor' in the traditional sense, is nonetheless at least *eligible* for absolute prosecutorial immunity for certain actions taken while representing ACBSS, ACDSS, or both, in the allegations of abuse. Plaintiff does not contest this point, arguing instead that certain actions Herrick took were either non-prosecutorial or *ultra vires* and therefore not protected. The Court's task is to determine whether any of Herrick's actions indeed pulled him out from behind the shield of absolute immunity, as Plaintiff alleges.

*See Herrick*, 2011 WL 5075649, at *6.  *Herrick* makes no mention of Virginia's immunity law, and apparently the parties did not argue about whether it applied.  Regardless, this issue is now briefed.  I find Virginia's immunity law applies to Plaintiff's IIED claim.  Though not directly on point, multiple cases in this circuit and elsewhere strongly support this conclusion.[6]

Federal courts sitting in diversity or exercising supplemental jurisdiction apply state substantive law to pendent state claims.  *See Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938); *In re Exxon Valdez*, 484 F.3d 1098, 1100 (9th Cir. 2007) (finding *Erie* principles apply when a

---

[6] *Vosburg* itself does not address the issue.  Although its holding appears broad—"Virginia State social workers are absolutely immune from liability resulting from their decision to file a removal petition"—it dealt only with a federal § 1983 claim.  *Vosburg*, 884 F.2d at 133–34, 137–38.  *Vosburg* also drew repeatedly on the Supreme Court's reasoning in *Imbler v. Pachtman*, 424 U.S. 409 (1976), quoting that case as holding prosecutors "absolutely immune *from § 1983* actions."  *Vosburg*, 884 F.2d at 135 (quoting *Imbler*, 424 U.S. at 424) (emphasis added).

federal court exercises supplemental jurisdiction over state claims such that, regardless of "the basis of a federal court's jurisdiction over a state law claim[,] . . . [w]here state law supplies the rule of decision, it is the duty of federal courts to ascertain and apply that law.") (internal quotation marks omitted); *Maternally Yours v. Your Maternity Shop*, 234 F.2d 538, 540 n.1 (2d Cir. 1956) (same); *Haynes v. Marshall*, 887 F.2d 700, 704–05 (6th Cir. 1989) (finding that "when faced with a claim of immunity to a pendent state claim, federal courts look to the appropriate state law to ascertain the nature of the immunity given").

Several cases analogous to this one treat § 1983 and state claims differently for purposes of immunity. Although none directly provides a rule in this context, their outcomes lend credence to Plaintiff's argument that this Court should apply Virginia immunity law to his Virginia IIED claim. In *Wolf v. Fauquier Cnty. Bd. of Supervisors*, 555 F.3d 311, 317–23 (4th Cir. 2009), the Fourth Circuit applied Virginia's charitable immunity law to a plaintiff's state law claims while disposing of Plaintiff's § 1983 claims separately for failing to allege constitutional violations or name the proper parties.

The Fourth Circuit in *Garvin v. Alumax of South Carolina, Inc.*, 787 F.2d 910, 917–18 (4th Cir. 1986), found that "[w]hen state law creates a cause of action, the state is free to define the defenses to the claim, including the defense of immunity, unless the state rule is in conflict with federal law." *Id.* at 917. In an area of law governed both by federal statute and state law, where state law created a third party cause of action, the court applied the state's immunity law to the claim. *Id.* at 917–18. It observed that although the state's immunity rule was different than that in the federal statute, the two were not in conflict because:

> Congress has not purported to prescribe the immunity rules to be applied by states in actions brought upon state law claims. The federal immunity rule is to be applied when the third party claim is a federal claim; when the third party claim is a state law claim, the immunity rules of that state are to be applied. The federal

and state statutes are readily harmonized, and each may function in its own sphere without interference with the other.

*Id.   See also Gray-Hopkins v. Prince George's Cnty.*, 309 F.3d 224, 231–34 (4th Cir. 2002) (finding state law exempted officials from state law immunity for state negligence and intentional tort claims, and separately, that federal qualified immunity did not apply).

Applying Virginia's immunity law in this case is well supported by *Erie's* general mandate that federal courts apply state substantive law to state claims.  Virginia's legislature has codified the balance it wishes to strike between, on the one hand, protecting children's welfare by granting immunity for reporting abuse, and on the other, protecting parents from malicious or bad-faith reporting and removal proceedings.  Applying this substantive law accords with *Erie's* mandate that federal courts avoid applying a "federal general common law" to state claims, as such a tendency can result in federal judges "brushing aside the law of a state in conflict with their views."  *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).  Therefore, I find Virginia's immunity laws apply to Plaintiff's IIED claim, not federal common law *Vosburg* immunity.

### 3.  Virginia Code §63.2-1512: Qualified Immunity under Virginia Law

Defendants reassert that they are entitled to immunity for Plaintiff's tort claim under Virginia's reporter immunity statute, Va. Code Ann. § 63.2-1512 ("Immunity of person making report, etc., from liability"), given that, according to Defendants, they were acting at all times to protect the child.  They note that *Wolf v. Fauquier County Bd. of Supervisors*, 555 F.3d 311 (4th Cir. 2009), requires plaintiffs to "prove[]" bad faith or malicious intent to overcome this defense, and argue Plaintiff has pled insufficient facts to state a plausible claim for bad faith or malice.  These arguments repeat those Defendants made on the last motion to dismiss the Second Amended Complaint, and this Court rejected those arguments in *Nelson.  See Nelson v. Green*, No. 3:06-cv-00070, 2013 WL 4202225, at *6 (W.D. Va. Aug. 15, 2013).

15

Most of the logic in the *Nelson* Opinion remains applicable to Defendants' arguments on this Complaint, and the result on this motion to dismiss remains the same. The ACDSS Defendants are not entitled to immunity under Virginia law at this time. However, I address the ACDSS Defendants' arguments that Plaintiff does not allege sufficient bad faith or malice against each of them individually to exempt them from immunity.

Virginia Code § 63.2-1512 provides immunity to "any person": (1) "making a report pursuant to § 63.2-1509," (2) making "a complaint pursuant to 63.2-1510," (3) "who takes a child into custody pursuant to 63.2-1517," or (4) "who participates in a judicial proceeding resulting" from a custodial seizure pursuant to 63.2-1517. Va. Code § 63.2-1512. This applies "unless it is proven that such person acted in bad faith or with malicious intent." *Id.* Virginia Code § 63.2-1509 legally requires certain mental health professionals and social workers to report suspected child abuse or neglect, and § 63.2-1512 then protects mandatory and voluntary reporters.[7] *See Wolf*, 555 F.3d at 317. The immunity standard for voluntary and mandatory reporters depends on whether the court finds bad faith or malice, and the Supreme Court of Virginia has not provided guidance on these terms in the context of § 63.2-1512. *See id.* at 318.

*Wolf* provides several important insights. First, Plaintiff has the burden to "overcome the presumption to prove that immunity should not attach." *Id.* The presumption that immunity should attach is a "high bar" to overcome. *Id.* Second, "the words 'malicious intent' obviously require some kind of malign motive," and "bad faith," means something like "dishonesty of belief or purpose" – "[n]egligence or mistake does not rise to the level of dishonesty." *Id.* (internal citations omitted). Third,

---

[7] As in *Wolf*, I have considered that mandatory reporters face criminal penalties in Virginia for failing to report suspected child abuse. *See* Va. Code § 63.2-1509; *Wolf*, 555 F.3d at 318. All the Defendants in this case were mandatory reporters under Virginia law, and I have accounted for their obligations in considering whether Plaintiff sufficiently pleads bad faith or malice to exempt them from immunity.

16

Whether the standard is thus the subjective one of malicious intent or the more objective one of bad faith, it is plain that Virginia law requires something more than a mistaken report, or a report based on a misunderstanding, or even a report that was negligently tendered. So long as the reporter was acting in the interest of protecting a child rather than out of self-interest or with an intent, for example, to settle some score with the child's parent, the plain intent of the legislature was to allow immunity to attach to the reporter.

In other words, the statute provides that immunity will dissolve only in those infrequent circumstances where someone used the reporting system for purposes other than that for which it was designed—namely, the protection of children.

*Id.* at 318–19 (internal citations omitted).  Finally, the court in *Wolf* specifically noted that plaintiffs in that case did not "allege[] or suggest[] any untoward animus, pre-existing bad blood, desire for revenge, or the like that would strip [defendant] of immunity." *Id.* at 319.  Neither did plaintiffs in *Wolf* suggest "that [defendant] was acting only in furtherance of her own interest and with complete disregard for [p]laintiffs' interests." *Id.* (internal quotation marks omitted).

Under Virginia law, Plaintiff must ultimately "prove" each individual defendant acted with bad faith or malice to overcome their presumptive immunity under § 63.2-1512.  On motions to dismiss, Plaintiff's factual allegations receive the presumption of truth and all reasonable inferences are drawn in their favor.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  Yet, qualified immunity presents a special context.  It requires that this Court respect the Virginia legislature's wishes to guard reporters of suspected child abuse not only from liability, but also from the inconveniences of litigation and even discovery.  *See cf. Mitchell v. Forsyth*, 472 U.S. 511, 526–27 (1985) (noting the policy of federal qualified immunity is to shield officials from the costs and risks of standing trial *and* from the hassle of facing disruptive pretrial matters).  Of course, Virginia has chosen to guard only those reporters who have acted without bad faith or malice.

Therefore, to allege a plausible claim that Defendants are not entitled to the presumption of reporter immunity under § 63.2-1512 at the motion to dismiss stage, Plaintiff must "adequately allege the commission of acts that [demonstrate bad faith or malice]" under *Twombly* and *Iqbal's* familiar pleading rules.  *See Mitchell*, 472 U.S. at 526 (noting defendants are entitled to "dismissal before the commencement of discovery" unless "plaintiff's complaint adequately alleges the commission of acts that violated clearly established law").  In other words, Plaintiff must "satisfy the court as to the availability of evidence that demonstrates [Defendants] acted with . . . malice [or bad faith]."  *See cf. Howe v. Andereck*, 882 So. 2d 240, 245 (Miss. Ct. App. 2004) (finding that at motion to dismiss stage, plaintiff had to satisfy this standard to overcome the good faith presumption of Mississippi's reporter immunity statute).

### a)  Plaintiff's Factual Allegations

Plaintiff has adequately alleged the commission of acts that demonstrate bad faith or malice, sufficient at this stage to exempt all the ACDSS Defendants from immunity under § 63.2-1512.  As a whole, the allegations paint an appalling picture of a social worker and her supervisors stubbornly siding with one parent, pursuing her accusations against Plaintiff in violation of multiple J&DR Court orders, enabling and participating in further traumatizing Plaintiff's child, prosecuting Plaintiff judicially and administratively for alleged sexual abuse of his daughter, bolstering these prosecutions with biased, false, and misleading information, destroying evidence related to their investigation to avoid scrutiny,[8] failing to review their own findings as their regulations require, refusing to hear or revise accusations against Plaintiff upon

---

[8] With the knowledge and approval of her supervisors Casey, Freeman, and Ralston, Green allegedly refused to tape the session with Vaughan-Eden and Plaintiff's child, then later "destroyed her contemporaneous notes from the session" despite state law ACDSS policies to the contrary, "in a deliberate effort to block the father from analyzing the [session's] coercive techniques or rebutting it."  3d Am. Compl. ¶¶ 51–53.  On information and belief, Plaintiff also claims "Defendants destroyed numerous documents and records related to their investigation of [Plaintiff]."  *Id.* at ¶¶ 55, 101(v).

multiple judicial and administrative refutations of their conclusions, making and breaking promises to the J&DR Court that they would alleviate some of their restrictions against Plaintiff, helping the mother of Plaintiff's daughter disobey court orders and interfere with her child's court-appointed mental health professional, and generally failing to act in Plaintiff's daughter's best interests, as the Circuit Court of Albemarle County eventually found.

First, Plaintiff alleges Green directly violated multiple J&DR Court orders meant to protect his child from traumatic sexual abuse examinations, with the direct approval and support of her supervisors Casey, Ralston, and Freeman.[9]  Violations of these orders allegedly led to a "false" and "unreliable" disclosure of abuse by Plaintiff's daughter to Vaughan-Eden,[10] which Defendants then used to file a removal petition in state court and to establish a 'founded' administrative disposition within their agency.  3d Am. Compl. ¶¶  58, 60.  Despite the J&DR Court and their own parent agency refuting those findings of abuse and noting the disclosure to

---

[9] Plaintiff alleges "several therapists," U.Va. hospital personnel, the director at his child's daycare,  and his child's *guardian ad litem* reported the mother to ACDSS Defendants for abuse or misconduct after her repeated requests for intrusive medical and psychological exams on allegations of Plaintiff's sexual abuse.  3d Am. Compl. ¶¶ 29–21, 101(l).  In August of 2004, to prevent these incidents, Plaintiff avers the J&DR Court prohibited anyone from taking the child to "additional social workers, therapists, or doctors on allegations of abuse" without approval of the court-appointed therapist.  *Id.* at ¶ 22.  Nevertheless, Plaintiff alleges the ACDSS Defendants approved the mother's recommendation of Vaughan-Eden to psychologically evaluate her child, and intentionally "conspired with the mother to set up a 'secret evaluation' [with Vaughan-Eden] behind the back of the JDR Court, the child's court-appointed therapist, the child's *guardian ad litem*, and the father," without seeking the approval of the court's therapist as ordered.  *Id.* at ¶ 24.  Plaintiff also alleges the ACDSS Defendants violated the J&DR Court's order that the child should remain at a designated daycare facility after the daycare director reported the mother to Defendants. Ignoring the order, the Defendants allegedly "informed the mother of the director's concerns, and then helped the mother remove the child" from that facility.  *Id.* at ¶ 101(p).

[10] Plaintiff alleges that "[w]ith approval and acquiescence of her three supervisors (Ralston, Casey, Freeman), Defendant Green set out to bias Vaughan-Eden's sessions with the child against the father with an objective of extracting from the child a false or unreliable disclosure," including concealing prior evaluations refuting sexual abuse and allegations the mother had coached the child, supplying "false and prejudicial information" about Plaintiff to Vaughan-Eden and allowing the mother to do the same, and instructing Vaughan-Eden not to meet with the father and to violate examination protocols.  *Id.* at ¶¶ 36–37.  Green and Vaughan-Eden allegedly met with Plaintiff's daughter in two back-to-back, 45-minute, untaped sessions and "forced her to make a false disclosure against her will" that "[a]ll Defendants knew or should have known . . . would yield false information" because of the techniques used.  *Id.* at ¶¶ 46, 48, 57.  Alleging that failure to tape the examination violated state law, Plaintiff avers "Defendants Casey, Freeman, and Ralston knew about, approved and acquiesced in Green's violation of state law, failure to tape, and destruction of notes."  *Id.* at ¶¶ 51–53.

Vaughan-Eden was "flawed,"[11] Defendants maintained their removal petition and administrative disposition. *Id.* at ¶ 77. Consequences to Plaintiff included having his name placed on a "central registry of abusers," restrictions on his role in his daughter's educational activities, and the ACDSS Defendants' restriction "for almost five years" that he could only have three hours of supervised visitation time per week with his daughter. *Id.* at ¶¶ 65–66 114.

When various courts began to find Vaughan-Eden's evaluation was flawed, that there was no evidence Plaintiff abused his daughter or that he had not done so, he alleges "the Defendants decided to cover their tracks to conceal their own misconduct," continuing to "investigate and accuse [Plaintiff] long after they knew or objectively should have known that the disclosure was false and that [Plaintiff] was innocent." *Id.* at ¶¶ 91, 12–16.[12] Freeman specifically upheld the founded determination of Green and Casey, writing "an opinion that was intended to 'rubber stamp' the flawed work of his subordinates and cover up their mistakes." *Id.* at ¶ 67. In front of the J&DR Court, Green allegedly represented that the ACDSS Defendants would increase Plaintiff's visitation time with his daughter after the State DSS reviewed the founded disposition. *Id.* at ¶¶ 61, 100. But after the State DSS found in Plaintiff's favor, the ACDSS Defendants refused to grant Plaintiff more visitation time. *Id.* at ¶¶ 61, 100. In January 2006, Defendants assisted the mother in pursuing abuse allegations by violating a court order. They allegedly concealed from the J&DR Court that the mother surreptitiously taped the child's

---

[11] The J&DR Court found in 2005 that "Defendant's evidence [was] deeply flawed and insufficient to prove abuse." *Id.* at ¶ 77(b). Considering an appeal of ACDSS' 'founded' disposition of abuse, ACDSS' parent agency found Defendants' evidence flawed and that they "did not even come close to proving [their] case by a preponderance of the evidence" in July of 2006. *Id.* at ¶ 77(c).

[12] Alleged misconduct includes Green's destruction of her contemporaneous notes of Vaughan-Eden's evaluation (with approval of the other Defendants), and destruction "of public records (including internal and external communications) relevant to [the] investigation." *Id.* at ¶¶ 55, 101(v). Plaintiff also alleges Defendants "intentionally" failed to conduct a risk assessment of their founded determination, which would have analyzed the reliability of evidence gathered during the investigation, because they "did not want [Plaintiff] to be reunited with his child." *Id.* at ¶ 101(q).

court-appointed therapist "in an effort to discredit her and end the therapeutic relationship" after the therapist "began to conclude that the child had not been abused by [Plaintiff]."[13]

Ultimately, the Circuit Court of Albemarle County found on September 16, 2009 that "[Plaintiff] had not abused the child." *Id.* at ¶ 77(e). In February 2009, it had dismissed the ACDSS Defendants from the case because it found Defendants "were not serving the child's best interests," after their admission "that they had no basis for maintaining their false allegations since July 14, 2006, when the parent agency had rejected their allegations." *Id.* at ¶¶ 77(e), 79. Finally, Plaintiff avers that in "January 2013, the Circuit Court disqualified the Defendants and their agency from any further involvement with the child." *Id.* at 79.

Defendant pleads that "[e]ach Defendant participated in a [five-year] campaign" to "deliberately, recklessly, unlawfully, with bad faith and/or with malice or gross negligence" "maintain[] and perpetuate[] . . . false and heinous allegations that [Plaintiff] anally sodomized his child long after [their] falsity was exposed." *Id.* at ¶¶ 101, 111–12, 120. He claims they "communicated with each other regularly about the actions they were taking in connection with [Plaintiff] and his child" and points to Green's email observing that " 'all decisions [regarding Plaintiff] are made in conjunction with counsel, supervisors [Casey] and assistant director [Freeman] and director [Ralston] of DSS.' " *Id.* at ¶ 12. Plaintiff alleges that Green and Casey were directly involved in making, approving, and executing the actions at issue. *See id.* at ¶ 12–14. He claims Director Ralston and Assistant Director Freeman "intentionally refused to correct the false disclosure," misconduct, "false findings," or "the erroneous administrative findings of

---

[13] Plaintiff alleges the J&DR Court first "entered a Protective Order, dated November 1, 2005, enjoining any party from further interference with the child's therapists." *Id.* at ¶ 101(n). Then "Defendants intentionally" violated this order after the therapist informed the mother she did not believe Plaintiff abused his daughter. *Id.* The mother taped conversations with the therapist. "Defendant Green was aware of the taping and subsequent transcription of the telephone conversation. Defendant Green, with approval or Ralston, Freeman and Casey, warned the mother that she might be punished for her conduct, but concealed the mother's violation from the Court-appointed therapist and the JDR Court." *Id.* That therapist later resigned and "Defendant Green intervened to persuade prosecutors to overlook the mother's misconduct" but "failed to [ever] provide the child any replacement therapy." *Id.* at ¶¶ 101(n), (o).

abuse," acting with "deliberate indifference . . . in derogation of [Plaintiff's] rights" and making or participating in "decisions to double down on false accusations" and "cover up misconduct in order to harm [or persecute] Plaintiff and avoid scrutiny" of misconduct.  *Id.* at ¶¶ 15–16.

### b) Bad Faith or Malice under Va. Code § 63.2-1512 and *Wolf*

Plaintiff's allegations tie each individual Defendant, through actions, approval, supervision, or validating decisions, to a "malign motive" or "dishonesty of belief or purpose" beyond mere negligence, mistake, or misunderstanding.  *See Wolf*, 555 F.3d at 318.  Taken as true with all reasonable inferences drawn in their favor, Plaintiff's factual allegations suggest that in reporting Plaintiff, Defendants were not "acting in the interest of protecting a child," as the Virginia immunity scheme seeks to protect.  Instead, Defendants allegedly helped to create an unreliable disclosure of abuse by badgering the child, violating court orders meant to protect the child and Plaintiff, ignoring the mother's misconduct and evidence contraindicating abuse that resulted in those court orders, actively and passively leaving the child open to traumatic examinations and coaching (sometimes without being present, again in violation of court orders), and refusing to consider any evidence to the contrary.[14]

Unlike the plaintiff in *Wolf*, this Plaintiff pleads an "untoward animus" that strips the ACDSS Defendants of immunity – that they were "acting only in furtherance of [their] own interest and with complete disregard for Plaintiff['s] interests."  *See id.* at 318–19.   Plaintiff

---

[14] It is unclear whether § 63.2-1512 would partially cover Defendants only for their a portion of their actions—say, for filing the removal petition and for some pursuit of that petition in court—if their pre-petition conduct insufficiently showed bad faith or malice.  *See* Va. Code § 63.2-1512 ("Any person making a report pursuant to § 63.2-1509 . . . or who participates in a judicial proceeding resulting therefrom *shall be immune from any civil or criminal liability in connection therewith*, *unless it is proven that such person acted* in bad faith or with malicious intent.").  Perhaps once Defendants had sufficiently "acted" with bad faith or malicious intent, their immunity would dissolve from that point onward.  I need not decide this issue, as all the misconduct alleged in the paragraph above occurred before the ACDSS Defendants filed a removal petition.  These allegations sufficiently show bad faith and malice to exempt these Defendants from immunity for their entire conduct, from reporting onward, on this motion to dismiss.  Allegations of how Defendants continued to pursue judicial and administrative proceedings strengthen the plausibility of bad faith or malice for Defendants' post-reporting actions, but also lend plausibility to Plaintiff's claims Defendants acted with dishonesty or animus all along.

alleges Defendants were motivated by a favoritism of the mother, a desire to help her "persecute" Plaintiff, a zeal to prove, substantiate, and maintain abuse allegations regardless of the evidence or consequences, and an interest in covering up their dishonesty and misconduct by validating their abuse claims.  3d Am. Compl. at ¶¶ 12, 15–16, 101, 111–12, 120.  The plaintiff in *Wolf* failed to allege *any* acts of dishonesty or malicious motivations, even at the summary judgment stage.  *See Wolf*, 555 F.3d at 318–19.  It made little sense to deny the cloak of immunity to a good-faith reporter in those circumstances.  In this case, on a motion to dismiss, with ample allegations that the ACDSS Defendants placed their own interests or animus above the interests of Plaintiff and his child, the ACDSS Defendants are not entitled to immunity under § 63.2-1512.

### *4. Whether Plaintiff States a Plausible Claim for IIED*

Having settled that the ACDSS Defendants are entitled to neither federal common law immunity nor state reporter immunity, I now address the merits of Plaintiff's IIED claim.  The IIED tort requires a plaintiff to prove four elements: (1) the wrongdoer's conduct was intentional or reckless; (2) the conduct was outrageous and intolerable; (3) there was a causal connection between the wrongdoer's conduct and the emotional distress; and (4) the emotional distress was severe.  *Harris v. Kreutzer,* 271 Va. 188, 204, 624 S.E.2d 24, 33 (Va. 2006) (citation omitted). Virginia courts have repeatedly emphasized that the IIED tort is "not favored" in the law, given that "there are inherent problems in proving a claim alleging injury to the mind or emotions in the absence of accompanying physical injury." *See Supervalu, Inc. v. Johnson,* 666 S.E.2d 335, 343 (2008) (citations omitted).

The ACDSS Defendants challenge both whether Plaintiff sufficiently alleges outrageous and intolerable conduct against each defendant individually, and whether Plaintiff has pled that he suffered the kind of severe emotional distress required by Virginia law.  This Court declined

to dismiss the Second Amended Complaint on these same objections, but new details in the Third Amended Complaint necessitate a fresh examination.  For the reasons that follow, I find Plaintiff pleads sufficient facts to state a plausible IIED claim against the ACDSS Defendants.

### a) The Federal Pleading Standard for Virginia IIED

In his Third Amended Complaint, Plaintiff complied with this Court's implication that he should amend Count V of his complaint to include "additional details" about "the severity of his emotional distress."  *Nelson v. Green*, No. 3:06-cv-00070, 2013 WL 4202225, at *15 (W.D. Va. Aug. 15, 2013).  Citing one of this Court's opinions, Defendants argue Plaintiff's more specific pleading of his IIED claim means that this Court must now analyze the sufficiency of his allegations under Virginia's substantive law.   ACDSS Mot. to Dismiss 8 (citing *Harris v. Americredit Fin. Servs. v. Absolute Recovery*, No. Civ.A.3:05CV00014, 2005 WL 2180477, at *3–4 (W.D. Va. Sept. 9, 2005)).  During the hearing, Plaintiff seemed to argue that the Rule 8 federal pleading standard should apply instead of Virginia substantive law.

Under Rule 8, even a plaintiff pleading a disfavored Virginia IIED claim need only "give [the defendant] fair notice of [plaintiff's claim] and the grounds upon which it rests."  *Hatfill v. New York Times Co.*, 416 F.3d 320, 337 (4th Cir. 2005) (internal citation and quotation marks omitted), *cert. denied*, 547 U.S. 1040 (2006).  In *Hatfill*, general allegations of "severe and ongoing loss of reputation and professional standing, loss of employment, past and ongoing financial injury, severe emotional distress and other injury" pled sufficiently severe emotional distress to satisfy federal pleading requirements.  *Id.*  Of course, *Hatfill* was decided before *Twombly* and *Iqbal*, which clarified that conclusory allegations are not entitled to a presumption of truth and cannot alone meet federal pleading standards.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  But under

*Twombly* and *Iqbal*, courts presume the truth of well-pleaded factual allegations and seek to determine whether they plausibly give rise to a claim for relief. *Id.* at 679.

The Fourth Circuit has not overruled *Hatfill*, and it remains true that Virginia IIED claims "need not be pled [in federal court] with the degree of specificity required by Virginia courts." *Harris v. Americredit Fin. Servs. v. Absolute Recovery*, No. Civ.A.3:05CV00014, 2005 WL 2180477, at *3 (W.D. Va. Sept. 9, 2005). Federal pleading standards still apply to Plaintiff's IIED claim, if requiring somewhat more stringent factual pleading than before *Twombly* and *Iqbal*. Accordingly, as in *Harris*, I will analyze Plaintiff's IIED claim for plausibility "along the lines of Virginia's substantive law, not its pleading requirements."[15] *Id.* at 3.

### b) Outrageous and Intolerable Conduct

Whether conduct is outrageous and intolerable under Virginia law is a question of law for the court. *Paroline v. Unisys Corp.*, 879 F.2d 100, 112 (4th Cir. 1989) *vacated in part on other grounds*, 900 F.2d 27 (4th Cir. 1990). In Virginia, the conduct alleged must be "outrageous and intolerable in that it offends against the generally accepted standards of decency and morality," or is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' " *Id.* at 112; *Russo v. White*, 400 S.E.2d 160, 162 (Va. 1991).

The Supreme Court of Virginia has explained that plaintiffs must show outrageous and intolerable conduct so courts can "limit[] frivolous suits and avoid[] litigation in situations where

---

[15] Because I find that Plaintiff states a plausible claim for Virginia IIED under even this more stringent standard, I find he would also state a plausible IIED claim under *Hatfill's* more relaxed standard if it applied here.

only bad manners and mere hurt feelings are involved." *Womack v. Eldridge*, 210 S.E.2d 145,

148 (Va. 1974). Furthermore, a court's role in assessing outrageous and intolerable conduct is

> to determine, in the first instance, whether the defendant's conduct may
> reasonably be regarded as so extreme and outrageous as to permit recovery, or
> whether it is necessarily so. Where reasonable men may differ, it is for the jury,
> subject to the control of the court, to determine whether, in the particular case, the
> conduct has been sufficiently extreme and outrageous to result in liability.

*Id.* (internal quotation marks omitted).

In Virginia, allegations that a defendant deceptively or falsely accused a plaintiff of

sexually-tinged impropriety or abuse have described sufficiently outrageous and intolerable

conduct to survive a motion to dismiss. In the first case to recognize the IIED claim in Virginia,

*Womack v. Eldridge*, the Supreme Court of Virginia found that alleging a defendant fraudulently

obtained a photograph of the plaintiff and used it in a public trial to implicitly accuse plaintiff of

molesting two young boys created a jury question about whether the conduct was extreme and

outrageous. *Id.* In *Womack*, the plaintiff's photograph was shown to the victims in the

molestation trial. Although they denied he was the molester, he was called to testify, questioned

multiple times by police, and summoned to appear before the grand jury. *Id.* at 146–47.

More recently, in *Almy v. Grisham*, the Supreme Court of Virginia found alleging that

defendants schemed to falsely accuse a plaintiff of sending letters denouncing one defendant for

marital infidelity pled sufficiently outrageous and intolerable conduct to survive a demurrer.

*Almy v. Grisham*, 639 S.E.2d 182, 187 (Va. 2007). The defendants in *Almy* allegedly improperly

obtained confidential documents from the plaintiff's child's school, used them to generate a

handwriting report about the plaintiff, "influenced the wording of [that report], causing [a

handwriting expert] to issue a false report implicating [the plaintiff]," and deceived a police

officer into confronting the plaintiff by telling him the report definitively implicated plaintiff. *Id.*

Since reasonable persons could view this conduct as outrageous and intolerable and the other

IIED elements were properly pled, the court held "the controversy must be resolved at a trial on the merits of the claim, rather than by a circuit court on demurrer." *Id.* at 187, 189.  Quoting this standard, a court in the Eastern District of Virginia found allegations that "defendants engaged in a scheme orchestrated to accuse the [p]laintiffs of harboring and disseminating pornography" sufficed to survive a motion to dismiss.  *Harrington v. Sprint Nextel Corp.*, No. 1:08CV336 (JCC), 2008 WL 2228524, at *4 (E.D. Va. May 29, 2008).  The plaintiffs in *Harrington* were accused of this conduct in front of coworkers and fired using these allegedly false allegations, based on deception about the company's policies and fabricated rationales.  *Id.* at *1.

*Womack*, *Almy*, *and Harrington* demonstrate that Plaintiff has pled sufficiently outrageous and intolerable conduct to survive a motion to dismiss.  He does not solely describe a scenario of bad manners and hurt feelings that courts should view as insufficiently outrageous. Among other claims, Plaintiff alleges that Defendants violated court orders, coerced a disclosure of sexual abuse from his four year old daughter, took public legal action against him based on that disclosure, ignored evidence he was innocent, refused to revise visitation restrictions despite representations to the contrary and evidence of his innocence, and disregarded an administrative finding by Defendants' state agency that Plaintiff was innocent based on their evidence.  A reasonable person could feel resentful and outraged about this conduct and view it as atrocious and exceeding all bounds of decency.  Plaintiff's allegations also sufficiently implicate each individual defendant, as he has repeatedly averred their individual knowledge, supervision, and approval of the actions taken against him and his child.[16]  Therefore, taken as true, Plaintiff sufficiently pleads outrageous and intolerable conduct by each defendant at this stage.

---

[16] Defendants argued "the actual factual allegations against them individually with respect to actions prior to the Petition filed by the ACDSS after the February 9, 2005 alleged coerced disclosure do not constitute outrageous and intolerable conduct. Neither Ralston, Casey, nor Freeman is alleged to have been present when the child made the disclosure with . . . Lori Green . . . . Plaintiff claims the sexual abuse disclosure was the product of Co-Defendant

### c) **Severe Emotional Distress**

As the *Nelson* Opinion acknowledged, under Virginia law, "liability arises only when the emotional distress is extreme, and only where the distress inflicted is so severe that no reasonable person could be expected to endure it." *Russo v. White,* 400 S.E.2d 160, 162 (Va. 1991). Defendants argue Plaintiff has not met this standard. I find Plaintiff's allegations sufficiently state a claim for severe emotional distress under Virginia law and his claim will proceed forward.

At the hearing on these motions, Defendants argued Virginia law requires a plaintiff to allege emotional distress causing "the kind of severe symptoms that cause a 'complete disintegration of virtually every aspect of [the plaintiff's] life.' " *See also* V-E Mot. to Dismiss 12 (citing *Russo v. White*, 400 S.E.2d 160, 162 (Va. 1991), and *Harris v. Kreutzer*, 624 S.E.2d 24, 34 (Va. 2006)). Since Plaintiff has not pled precisely this level of emotional distress, Defendants argue he cannot prevail on his IIED claim. Despite this proposed standard for all IIED claims, I find Plaintiff's arguments persuasive. No court has ever found this specific standard must be met to plead the severity of emotional distress in Virginia. The standard forms only one component of the severity analysis, albeit an important one. Furthermore, the conduct leading to Plaintiff's emotional distress is far more extreme than the conduct in Defendants' precedents. Although the analyses of tortious conduct and the distress it causes are separate, it makes sense that more extreme conduct would more plausibly support allegations of severe emotional distress. Finally, although not pled in those exact words, I find Plaintiff alleges sufficient facts to approach even the standard Defendants propose. *See, e.g.*, 3d Am. Compl. ¶¶

---

Vaughan-Eden's interview alone with the child in which she instructed the child to make the disclosure to Green. Once Green heard the disclosure, she was obligated . . . to report [it]." ACDSS Mot. to Dismiss 9–10. Since I find Defendants are not entitled to reporter immunity, their more expansive conduct after they filed the removal petition now supports Plaintiff's IIED allegations. Additionally, emphasizing Green's sole presence at Vaughan-Eden's evaluation and for other violations of court orders and state law ignores the alleged knowledge and ratification of Green's actions by the other ACDSS Defendants.

122–126 (including allegations that Plaintiff's distress resulted in the severe impairment and practical destruction of Plaintiff's daily personal and professional life for many years).

A comparison of Plaintiff and Defendants' main authorities illustrates this principle, and shows Plaintiff has sufficiently pled that he suffered severe emotional distress under Virginia law. Courts have found emotional distress insufficiently severe when plaintiffs do not allege they lost income or sought medical or therapeutic attention, and when distress results from conduct more akin to bad manners than an outrageous offense. In these circumstances, courts seem to doubt the plausibility of truly severe emotional distress.

In *Russo v. White*, 400 S.E.2d 160, 162–63 (Va. 1991), a single-parent plaintiff alleged "she was nervous, could not sleep, experienced stress and 'its physical symptoms,' withdrew from activities, and was unable to concentrate at work" after a man she dated once called her and hung up about 5–6 times per day for two months. The Supreme Court of Virginia observed plaintiff did not claim "that she sought medical attention, that she was confined at home or in a hospital, or that she lost income," and the court found "the alleged effect on the plaintiff's sensitivities is not the type of extreme emotional distress that is so severe that no reasonable person could be expected to endure it." *Id.* at 163. It upheld the trial court's judgment to dismiss her claim on a demurrer. *Id.* Three justices dissented from that conclusion, finding plaintiff sufficiently alleged a jury question on the severity of her emotional distress. *Id.* at 163–64.

In *Pacquette v. Nestle USA, Inc.*, No. 4:06CV00060, 2007 WL 1343794 (W.D. Va. May 7, 2007), a court in the Western District of Virginia found a plaintiff could not state a plausible IIED claim on allegations the defendant insulted him "by calling him dishonest in his exit interview." *Id.* at *2, 4–5. The claim failed on the conduct's outrageousness and on the severe emotional distress prong. The court found allegations of " 'anger, pain, suffering, shock, dismay,

29

nightmares, sleeplessness, dread, sorrow, grief, humiliation, six months of loss of appetite, [and] six months of apparent post traumatic stress syndrome,' as a result of the Defendant's conduct" insufficient to support an IIED claim and granted the defendant's motion to dismiss. *Id.* at *5 (citing *Russo*, 400 S.E.2d at 163, and *Harris*, 2005 WL 2180477, at *3–4).[17]

A court in the Eastern District of Virginia relied somewhat on Defendants' proposed standard in *Long v. Teradata Corp.*, No. 1:12-CV-787 JCC/TCB, 2012 WL 3947811, at *1–2, 5–6 (E.D. Va. Sept. 10, 2012).  There, the court found allegedly false sexual harassment accusations leading to termination and prevention from further employment insufficiently outrageous and causing insufficiently severe emotional distress to survive a motion to dismiss. In *Long*, the plaintiff claimed "ongoing anorexia, alopecia, accelerated hypertension, and stress related insomnia with endogenous depression" resulted from these allegedly false accusations, along with his inability to obtain another job despite interviewing with over 30 companies. *Id.* Plaintiff's symptoms all "f[ell] into the category of stress and stress-related physical symptoms," the court found.  *Id.* at 5.  Further, rather than plaintiff's "emotional distress itself" being "so severe as to 'render [plaintiff] functionally incapable of carrying out [plaintiff's] work,' " the

---

[17] Other cases cited by Defendants in briefs and at the hearing likewise stem from non-outrageous conduct that did not plausibly result in sufficiently severe emotional distress, or from plaintiffs claiming severe emotional distress but facing conflating causes or not acting in accordance with the claimed severity.  *See, e.g.*, *Harris v. Kreutzer*, 624 S.E.2d 24, 34 (Va. 2006) (alleging insufficiently severe emotional distress and non-outrageous conduct where court-assigned psychologist yelled at plaintiff and accused her of faking brain injuries, causing "nightmares, difficulty sleeping, extreme loss of self-esteem and depression, . . . additional psychological treatment and counseling," and "mortification, humiliation, shame, disgrace, and injury to reputation"); *Rodarte v. Wal-Mart Associates, Inc.*, No. 6:12-CV-00055, 2013 WL 1898999 (W.D. Va. May 6, 2013) (alleging termination due to improper application of price match discounts and conclusory severe emotional distress); *Brown v. Gilner*, No. 1:10-cv-00980 (AJT/IDD), 2012 WL 4473086, at *3–4, 10 (E.D. Va. Sept. 25, 2012) (after bench trial, finding insufficient emotional distress for Virginia IIED where victim of Ponzi scheme alleged loss of life savings and companionship with friends and family, potential foreclosure on his home, and "severe depression, stress, nervousness, sleeplessness, and inability to concentrate," with equivocal evidence about the causes of some of these stresses); *Jackson v. Fletcher*, No. 7:09CV00408, 2011 WL 197954, at *12 (W.D. Va. Jan. 18, 2011) (finding insufficiently severe emotional distress on summary judgment where plaintiff reported multiple causes of symptoms of extreme emotional distress and plaintiff was only treated once for depression and anxiety, two years after the incident); *Bryan v. Fultz*, No. 1:08CV365, 2009 WL 334441, at *2–3 (E.D. Va. Feb. 10, 2009) (finding insufficient emotional distress on summary judgment when plaintiff was subjected to cross-gender strip search and cried repeatedly, was mortified, avoided letting her husband see her naked for weeks, and was diagnosed with acute stress disorder, yet sought only limited counseling, received no medical treatment or medicine, and did not miss work).

plaintiff in *Long* "merely [alleged] that a defendant's conduct interfered with [his] work or outside activities." *Id.* at 6.

*Long v. Teradata Corp.* is persuasive but not binding authority on this Court. But even under *Long's* standard, Plaintiff has pled that the impairment of his career, irreparable damage to his relationship with his daughter, and other harms resulted from Defendants' actions and the resulting severe emotional distress he suffered. *See, e.g.*, 3d Am. Compl. ¶ 126 (noting "[a]s a result of each Defendant's actions and the severe emotional distress each Defendant's conduct caused Plaintiff to suffer, Plaintiff's daily personal and professional life was severely impaired and practically destroyed for many years," and listing many impairments).

*Pennell v. Vacation Reservation Ctr. LLC*, 783 F. Supp. 2d 819 (E.D. Va. 2011), and *Almy v. Grisham*, 639 S.E.2d 182 (Va. 2007), both involve the kind of outrageous conduct and crippling emotional distress Plaintiff alleges, and plaintiffs in both *Almy* and *Pennell* survived motions to dismiss their IIED claims. In *Pennell*, a plaintiff alleged she was repeatedly ridiculed for her dwarfism and eventually fired because other employees could not stand to be in the same room with her. On the only three shifts she was allowed to work, she was repeatedly called "Shorty," told her boss could not find her due to her height, required to wait outside the building for other employees to clear the room, and forced to endure uproarious laughter at her boss' jokes about her height. *Pennell*, 783 F. Supp. 2d at 821. Defendants in that case argued plaintiff's distress was no more severe than that alleged and rejected in *Russo* and *Kreutzer*. The court found it was more severe, in part because of all-consuming, debilitating fear and humiliation that "effectively confined her at home and led her to lose income." *Id.* at 824.

The plaintiff in *Pennell* alleged

> that her distress was so severe that that she 'had difficulty managing her day-to-day activities, became fearful of applying for other employment lest she be forced

> to suffer similar degradation and humiliation, and feared leaving the house where she worried she might frighten or sicken someone else.'

*Id.* (internal quotation marks omitted).  Furthermore, the court observed that plaintiff's emotional distress affected her closest family relations, in that she could talk of nothing else and required constant reassurance, and that defendant's actions caused her worry about her daughter's future as a dwarf.  *Id.*  That kind of distress proved sufficient under Virginia's IIED standards to survive a motion to dismiss.  *Id.* at 824–25.

In *Almy*, the Supreme Court of Virginia reversed a trial court's dismissal of a plaintiff's IIED allegations.  Plaintiff suffered distress after defendants misled prosecutors and police into thinking she had written anonymous letters to defendants about their spouses' infidelity.  She was publicly accused of that conduct, endured a rude and demeaning visit from the police about the issue, and defendants violated of her son's confidential information to obtain her handwriting.  *Id.* at 185.  The court found the plaintiff adequately alleged severe emotional distress when she alleged she suffered

> from several debilitating conditions, including depression, nervousness, and an inability to sleep, which ultimately caused a complete disintegration of virtually every aspect of her life. She allegedly was unable to manage her mother's financial affairs, to carry out her family duties, or to perform her various charitable endeavors. Also relevant are Almy's allegations that due to her 'major depressive disorder' caused by the defendants' false accusations, she was required to undergo extensive therapy from Dr. Alexander.

*Id.*  The court distinguished the case from *Russo*, because the plaintiff in *Almy* "alleged that she was required to seek professional counseling because of her depression occasioned by the defendants' misconduct, [and] additionally alleged that the defendants' actions rendered her functionally incapable of carrying out any of her work or family responsibilities."  *Id.*

While Plaintiff has not alleged a complete disintegration of his life, or that he became functionally incapable of carrying out any work or family responsibilities, his allegations at this

stage do allege severe impairment and the practical destruction of Plaintiff's daily personal and professional life. Furthermore, he alleges that Defendant's actions and his emotional distress impaired his closest family relations, something that proved important in both *Almy* and *Pennell*. *See, e.g.*, ¶ 126(d) (claiming Defendants' actions and the resulting severe emotional distress caused the destruction of Plaintiff's ability to "develop and build early and foundational bonds with his daughter . . . from 2005 to 2009, and [that] his relationship with his daughter has been permanently damaged").

In the instant case, Plaintiff's crippling emotional distress analogizes more closely to plaintiffs' distress in *Almy* and *Pennell* than in *Russo*, *Kreutzer*, or other cases cited by Defendants.[18] Plaintiff's Complaint alleges that the Defendants' misconduct "caused Plaintiff's severe emotional distress," and that "Plaintiff's emotional distress has been severe and prolonged" from 2005 until the present. 3d Am. Compl. ¶¶ 122–23. Plaintiff adds that Defendants' actions stigmatizing him, separating him from his daughter, and involving him in a protracted years-long legal battle:

> [D]irectly and proximately caused him to suffer from Post Traumatic Stress Disorder from the beginning of this ordeal and continuing for several years. In addition, Mr. Nelson has suffered severe depression, anxiety, sleep disorders, nightmares, suicidal ideations and avoidance and detachment from ordinary activities from early 2005 until the present time.

3d Am. Compl. ¶ 124. Plaintiff also alleges he underwent "psychological therapy with a professional licensed therapist for three and a half years, from June 2005 until January 2009, and continuing faith-based therapy, and was taught other self-help coping mechanisms" he continues to use. *Id.* at ¶ 125. Finally, Plaintiff alleges that as a result of the severe emotional distress he suffered, his "daily personal and professional life was severely impaired and practically

---

[18] In Plaintiff's response, he argues his allegations do show "a complete disintegration of virtually every aspect of [his] life." Pl.'s Resp. 24 (citing *Almy*, 639 S.E.2d at 188).

destroyed for many years." *Id.* at ¶ 126.  He enumerates these impairments, including loss of income, loss of political activity related to his career, the inability to have a romantic relationship, irreparable damage to the relationship with his daughter, counseling fees for himself and his daughter, and insolvency that deepened his emotional distress.  *Id.*

These allegations about the distress Plaintiff suffered go farther than did those of plaintiffs in *Russo* and *Kreutzer*.  Furthermore, the allegations about *what Defendants did* to cause this distress analogize more closely to the defendants' conduct in *Almy* and *Pennell* than to that in *Russo* and *Kreutzer*.  As enumerated at length in this opinion, Defendants' conduct proves far more egregious than repeated hang-up calls to a single parent, calling an employee dishonest in an exit interview, a single cross-gender strip search, or even a financially crippling Ponzi scheme.  Defendants' conduct looks much more akin to ridiculing a person with dwarfism repeatedly at their place of employment or embarking on a campaign to falsely accuse a person of sending letters accusing others of marital infidelity – if not worse.  Although this inquiry focuses on the severity of Plaintiff's emotional distress, the egregiousness of a Defendant's conduct causing that distress bears on the plausibility of Plaintiff's claims.

Defendants' conduct allegedly reached into the most personal part of Plaintiff's life, his relationship with his daughter, and wreaked irrevocable damage on that relationship, and on innumerable other aspects of his personal, professional, financial, and public life.  The resulting emotional distress and its crippling effects on Plaintiff's life are plausibly severe as required by Virginia law on a motion to dismiss.  Since I have also found the ACDSS Defendants' conduct sufficiently outrageous and intolerable, Plaintiff's IIED claim survives their motion to dismiss.

### d)  Exhibits Submitted with the ACDSS Defendants' Reply

Defendants seek to introduce extrinsic evidence to prove Plaintiff's daily life could not have been as fundamentally and severely impaired as he claims.  To their reply brief, ACDSS

Defendants attach a copy of Plaintiff's business website, a docket sheet for a case in the Eastern District of Virginia, and other exhibits.  I will not consider these exhibits.  First, Defendants raised these arguments and attached these exhibits only in their reply brief.  "An argument not raised in an initial brief is considered waived."  *RMA Lumber, Inc. v. Pioneer Mach., LLC*, No. CIV.A. 6:08-CV-00023, 2009 WL 3172806, at *5 (W.D. Va. Oct. 1, 2009) (citing *Carter v. Lee*, 283 F.3d 240, 252 n. 11 (4th Cir.2002) ("[a]n issue first argued in a reply brief is not properly before [the Court]")).  Waiting to raise an issue until a reply brief denies the other party "an opportunity to respond, and so considering it now would be unfair . . . and would risk an improvident or ill-advised opinion on the legal issues raised."  *Cavallo v. Star Enter.*, 100 F.3d 1150, 1152 n.2 (4th Cir. 1996) (internal quotation marks omitted).  Second, even if Defendants had raised these issues sooner, two of the exhibits submitted are not the sort of facts of which this Court will take judicial notice on a motion to dismiss.[19]  In my broad discretion in these matters, I will not consider these tardy arguments and exhibits on these motions to dismiss.

### B.  Vaughan-Eden's Motion to Dismiss

Apart from the issues that apply uniformly to Vaughan-Eden and the ACDSS Defendants, Vaughan-Eden argues the conduct specifically attributed to her by the Complaint is not sufficiently outrageous and intolerable to satisfy Virginia's IIED standards.  Even if Plaintiff

---

[19] Rule 12(d) generally prohibits district courts from considering extrinsic evidence to the pleadings on motions to dismiss, unless the process is converted to summary judgment.  *See* Fed. R. Civ. P. 12(d).  Courts can take notice of facts under Federal Rule of Evidence 201, and the Fourth Circuit has approved a district court's broad discretion to consider a university's continuous enrollment requirement from its website on a motion to dismiss.  Fed. R. Ev. 201(c), (d); *Jeandron v. Bd. of Regents of Univ. Sys. of Maryland*, 510 F. App'x 223, 227–28 (4th Cir. 2013).  But under both provisions, courts consider information "capable of accurate and ready determination," or information akin to black-and-white facts.  *See Jeandron*, 510 F. App'x at 227 (citing Fed. R. Ev. 201(b) and *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007)); *O'Toole*, 499 F.3d at 1225 (counting cases taking judicial notice of an earnings history from a quarterly report, definitions of terms from almanacs, and public stock prices).  As the ACDSS Defendants' counsel well knows from his involvement in that case, in *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013), the Fourth Circuit instructed this Court that taking judicial notice of city council hearing content was improper in part because "the use to which [the information was] put" weighed the evidence that might support or contradict the complaint instead of simply testing its legal feasibility.  *Id.* at 558.  In the instant case, Defendants likewise ask this Court to disbelieve Plaintiff's allegations that he was crippled by his severe emotional distress, using his website and a docket sheet.  I will not weigh the evidence as Defendants request.

properly pled his claim, Vaughan-Eden asserts Virginia's immunity doctrines protect her, as Plaintiff has not alleged sufficient malice or bad faith on her part.  Finally, she argues the Complaint neither states a claim for punitive damages against her specifically, nor provides any basis for the award of attorneys' fees against any of the Defendants.  For the reasons that follow, I find Vaughan-Eden is not entitled to immunity under Virginia Code § 63.2-1512, Plaintiff pleads sufficiently outrageous and intolerable conduct to state a plausible IIED claim against her, and that Plaintiff's punitive damages claim against Vaughan-Eden survives her motion to dismiss (though I cap it at Virginia's statutory maximum amount).  I will strike Plaintiff's claim for attorneys' fees, costs, and expenses.

### 1.  Immunity under Va. Code § 63.2-1512

The same standards discussed for the ACDSS Defendants apply to Vaughan-Eden in determining whether she qualifies for immunity under Virginia Code § 63.2-1512.  To plausibly show that Vaughan-Eden is not entitled to the presumption of reporter immunity at the motion to dismiss stage, Plaintiff must "adequately allege the commission of acts that [demonstrate bad faith or malice]." *See Mitchell*, 472 U.S. at 526.   Bad faith or malice involve "some kind of malign motive," or "dishonesty of belief or purpose," and "[n]egligence or mistake does not rise to the level of dishonesty." *Wolf v. Fauquier County Bd. of Supervisors*, 555 F.3d 311, 318 (4th Cir. 2009) (internal citations omitted).  "So long as the reporter was acting in the interest of protecting a child rather than out of self-interest" or "with complete disregard for [p]laintiffs' interests," the reporter is entitled to immunity. *Id.* at 318–19.

Vaughan-Eden claims Plaintiff cannot meet this burden because at most, he pleads negligence, not ill motivation.  She points to Plaintiff's allegations that ACDSS kept the mother's misconduct from her and instructed her not to investigate Plaintiff.  Nor was she

provided information weighing in Plaintiff's favor.  Vaughan-Eden compares herself to the mental health professional in *Wolf*, accused of wrongfully reporting a plaintiff to social services, and says even if she "should have inquired or investigated further" by speaking with Plaintiff and the mother or by "assembl[ing] some objective foundation for her report," Virginia Code § 63.2-1512 does not mandate such actions.  V-E Mot. to Dismiss 11 n.5 (quoting *Wolf*, 555 F.3d at 319).  She is correct that mere negligence does not suffice to exempt her from liability under § 63.2-1512.  However, Plaintiff pleads more than the mere negligence discussed in *Wolf*.

In *Wolf*, a counselor believed a mother meant to kill herself, and possibly her children, after she talked with the mother about anxiety issues and suicidal thoughts.  *Wolf*, 555 F.3d at 319.  Although the contents of that conversation were disputed by the plaintiffs, they did not allege the mental health worker acted out of animus, or even in her own self interest with complete disregard for the mother's interests.  *Id.*  The professional conferred with several supervisors before reporting the mother to the state department of social services.  In finding that she qualified for immunity under § 63.2-1512, the Fourth Circuit refused to allow suits against counselors simply because a patient "disput[ed] the contents of a conversation during a counseling session."  *Id.*  Since counselors must keep their sessions confidential, they would have limited opportunities to counter plaintiffs' assertions and would face either lawsuits after reporting their suspicions, or penalties for not reporting those suspicions.  *Id.*

The instant case differs from *Wolf* in that this case involved examining a child about sexual abuse, and Plaintiff specifically alleges a course of action by Vaughan-Eden that suggests she was acting to protect her own interests, disregarding the protection of Plaintiffs' daughter and Plaintiff's interests.  First, Plaintiff's allegations accuse Vaughan-Eden of violating proper protocol in conducting the examination, thereby rendering any disclosure unreliable and

37

disregarding protections for the child being examined.  3d Am. Compl. ¶¶ 38–43, 47–48.  This included "failing to record [the sessions with Plaintiff's daughter] in violation of well-established professional standards."  *Id.* at ¶ 101(h).  Second, Plaintiff alleges "Vaughan-Eden destroyed all original notes from her sessions with the child after receiving a subpoena for her records while the case was pending before the JDR Court, intentionally preventing Plaintiff and the state court from examining or assessing the sessions with the child."  *Id.* (emphasis omitted).  Third, Plaintiff alleges Vaughan-Eden "misrepresented the nature of the sessions and the child's statements" to the J&DR Court.  *Id.* at ¶ 59.  Finally, Plaintiff alleges on information and belief that after the state courts found he had not abused his daughter, Vaughan-Eden "personally inform[ed] one or more newspaper reporters that Plaintiff abused his daughter and/or [caused] other individuals to so state on her behalf."  *Id.* at ¶¶ 101(w), 113 (alleging one news reporter called Plaintiff and said "Vaughan-Eden had contacted him, revealed the identities of Plaintiff and his child, and informed him that Plaintiff had abused his child.").

Plaintiff implies several motivations for this behavior, including Vaughan-Eden's relationship with the child's mother, her interest in earning fees, and her desire to conceal any misconduct she committed.  Plaintiff avers that the mother and her attorney first identified Vaughan-Eden and then got the ACDSS Defendants to approve her for the examination.  *Id.* at ¶¶ 26–28.  Plaintiff alleges that Vaughan-Eden worked closely with the mother's attorney in various cases and earned fees in cases referred to her by the attorney.  *Id.* at ¶ 26.  He also alleges that Vaughan-Eden "accepted payments from the mother" and had much contact with the mother and the mother's attorney, while avoiding contact with Plaintiff.  *Id.* at ¶¶ 37–38, 45, 50.

Taken as true, with all reasonable inferences drawn in Plaintiff's favor, these allegations plausibly show that Vaughan-Eden acted out of self interest or some animosity toward Plaintiff,

rather than in the interest of protecting Plaintiff's daughter.  Even if her conduct during the examination was merely negligent,[20] Plaintiff alleges both dishonest and self-interested actions by Vaughan-Eden that completely disregarded Plaintiff's interests.  Vaughan-Eden allegedly destroyed her contemporaneous notes of the session even while they were under subpoena, misled the state courts about the nature and content of the sessions, and contacted the media to accuse Plaintiff of sexually abusing his daughter (revealing the child and father's identities) as late as October 2009.  Virginia's immunity law is designed to protect the actions of a mental health professional who acts out of concern for a child's welfare after hearing about a risk to that child, even if those actions prove negligent or mistaken.  Vaughan-Eden's actions extend beyond negligence into the sort of dishonesty, malice, and self interest §63.2-1512 does not protect.

### 2.  Outrageous and Intolerable Conduct

Vaughan-Eden also argues her conduct is insufficiently extreme and outrageous to satisfy Virginia's IIED standard.  Plaintiff "must identify, with particularity, each individual defendant's culpable conduct; defendants cannot be grouped together without specification of which defendant committed which wrong."  *Arnlund v. Smith*, 210 F. Supp. 2d 755, 760 (E.D. Va. 2002).  As with the ACDSS Defendants, this Court must determine whether Vaughan-Eden's alleged conduct is individually "outrageous and intolerable in that it offends against the generally accepted standards of decency and morality," and is "to be regarded as atrocious, and utterly intolerable in a civilized community," arousing resentment and outrage in an average member of

---

[20] This Court may never know exactly how to classify Vaughan-Eden and Green's actions during the examination, as Plaintiff pleads that both women's notes about the session have been destroyed, and both failed to record it in violation of proper protocol and state law.  Although the inference involves fact finding that the Court will not undertake at this stage, Plaintiff's case for bad faith or malice by Vaughan-Eden is more plausible because he has pled facts from which a negative spoliation inference might be drawn at a later stage of the case, on a proper motion. *See generally Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 155–57 (4th Cir. 1995) (recognizing spoliation is "a rule of evidence" that need not be forecast in the pleadings but may be "administered at the discretion of the trial court"); *Ward v. Texas Steak Ltd.*, No. CIV. 7:03 CV 00596, 2004 WL 1280776, at *2–3 (W.D. Va. May 27, 2004) (noting under Virginia law, "where one party destroys material evidence, the other party may be entitled to an inference that the evidence, 'if it had been offered, would have been unfavorable' [to the destroying party]").

the community.  *Paroline v. Unisys Corp.,* 879 F.2d 100, 112 (4th Cir. 1989) *vacated in part on other grounds,* 900 F.2d 27 (4th Cir. 1990); *Russo v. White,* 400 S.E.2d 160, 162 (Va. 1991).

Vaughan-Eden's conduct presents a closer question than the conduct of the ACDSS Defendants.  Plaintiff also alleges that she deceptively or falsely accused him of sexual abuse, which has been found sufficiently outrageous and intolerable under Virginia case law.  *See, e.g.*, *Harrington v. Sprint Nextel Corp.*, No. 1:08CV336 (JCC), 2008 WL 2228524, at *4 (E.D. Va. May 29, 2008); *Almy v. Grisham*, 639 S.E.2d 182, 187 (Va. 2007); *Womack v. Eldridge*, 210 S.E.2d 145, 148 (Va. 1974).  But Vaughan-Eden played a more limited role in the process.  She conducted the initial examination and other evaluations, provided testimony for the state courts about her findings, and allegedly accused Plaintiff in the media in 2009.  But she did not set the tone for the investigation, administrative action, and reporting as did the ACDSS Defendants.

However, Plaintiff alleges Vaughan-Eden traumatized his child through a 90-minute, "emotionally and psychologically abusive" examination, first by herself and then with Green, "coerc[ing] the child to make a false disclosure of abuse against [her will]."  3d Am. Compl. ¶ 47.  She allegedly violated multiple protocols in doing so.  He alleges Vaughan-Eden and all other Defendants "knew or should have known that the alleged disclosure was extracted through a process so coercive and abusive and dubious that the process would yield false information," and that Vaughan-Eden's evaluation was "intentionally biased and reckless."  *Id.* at ¶¶ 48, 101(f).  Next, Vaughan-Eden reported her disclosure and provided testimony about it in state court.  Plaintiff alleges this testimony misled the state courts about her session and the disclosure itself.  After notes from her examination were ordered under subpoena, Vaughan-Eden allegedly intentionally destroyed those notes.  Finally, Plaintiff avers Vaughan-Eden told at least one reporter that Plaintiff had abused his child in late 2009, revealing both parties' identities.

Plaintiff's allegations against Vaughan-Eden plausibly describe conduct so "outrageous and intolerable [] that it offends against the generally accepted standards of decency and morality." *Paroline*, 879 F.2d at 112.  Plaintiff alleges Vaughan-Eden deceptively and falsely accused him of sexual abuse after coercing such an accusation from his four-year-old daughter, subsequently destroying evidence and misleading the courts  about the disclosure, and finally publicly accusing him of that abuse despite state court findings to the contrary.  Vaughan-Eden could have initially acted negligently and accused Plaintiff out of an honest belief that his daughter's disclosure was reliable.  But her subsequent actions do not credit that explanation of events, and all reasonable inferences should be drawn in Plaintiff's favor on these motions.

Undoubtedly, Plaintiff's sparser allegations against Vaughan-Eden do not contain as much to suggest that she deceptively or falsely accused him of sexual abuse as do his allegations against the ACDSS Defendants.   But they are sufficient at this stage to plead outrageous and intolerable conduct – especially since Plaintiff pleads facts from which a factfinder may be able to draw a negative spoliation inference at a later stage.  *See generally Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 155–57 (4th Cir. 1995) (recognizing spoliation is "a rule of evidence" that need not be forecast in the pleadings but may be "administered at the discretion of the trial court"); *Ward v. Texas Steak Ltd.*, No. CIV. 7:03 CV 00596, 2004 WL 1280776, at *2–3 (W.D. Va. May 27, 2004) (noting under Virginia law, "where one party destroys material evidence, the other party may be entitled to an inference that the evidence, 'if it had been offered, would have been unfavorable' [to the destroying party]").  Accordingly, I will deny Vaughan-Eden's motion to dismiss Plaintiff's IIED claim against her.

### 3. *Punitive Damages Claim Against Vaughan-Eden*

In Virginia, punitive damages may be awarded for malicious conduct, or upon a "showing of willful or wanton conduct which evinces a conscious disregard of the rights of others." *Booth v. Robertson*, 374 S.E.2d 1, 2 (1988); *Schieszler v. Ferrum College*, 233 F. Supp. 2d 796, 805 (W.D. Va. 2002). Plaintiff claims punitive damages in the amount of $5,000,000. As I have just found Plaintiff plausibly alleges that Vaughan-Eden acted with bad faith or malice, in complete disregard of his interests, I will not dismiss Plaintiff's punitive damages claim at this time. However, as Vaughan-Eden points out, Virginia Code § 8.01-38.1 caps punitive damages at a maximum of $350,000. I will therefore strike Plaintiff's punitive damages claim to the $350,000 maximum provided by Virginia law for this Virginia IIED claim. *See Erie R.R. v. Tompkins,* 304 U.S. 64, 78–79 (1938); Fed. R. Civ. P. 12(f); *Boren v. Nw. Reg'l Jail Auth.*, No. 5:13-cv-013, 2013 WL 5429421, at *11–12 (W.D. Va. Sept. 30, 2013).

### 4. *Attorneys' Fees*

In Second Amended Complaint, Plaintiff sought attorneys' fees under 42 U.S.C. § 1988 pursuant to his § 1983 claims. While he has referred to that claim to preserve it for appeal, the Third Amended Complaint now seeks attorneys' fees only as a general matter. As a general matter, "the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser" – "the American Rule creates a presumption that parties bear their own legal costs, win or lose." *In re Crescent City Estates, LLC*, 588 F.3d 822, 825 (4th Cir. 2009) (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 247 (1975)); *see also Mullins v. Richlands Nat'l Bank*, 403 S.E.2d 334, 335 (Va. 1991). A few exceptions apply, "such as when the losing party has willfully disobeyed a court order or has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Hyatt v. Shalala*, 6 F.3d 250, 254 (4th Cir. 1993) (citing *Alyeska Pipeline*

*Serv. Co.*, 421 U.S. at 257–60).  But the power to award fees under these exceptions can be exercised "only with respect to conduct occurring during the litigation, not conduct that gave rise to the cause of action."  *Kelly v. Golden*, 352 F.3d 344, 352–53 (8th Cir. 2003).  Additionally, "the power of a federal court to award fees is limited by [*Erie*] . . . in those cases in which state law requires an award of fees or prohibits such an award as a matter of state policy."  *Id.* (internal citation omitted).  Plaintiff has pled no facts to overcome the American Rule, or to suggest that any common law or state law exception applies.  Therefore, I dismiss his claim for attorneys' fees, costs, and expenses under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## V. CONCLUSION

As noted above, I find *Vosburg* immunity does not apply to Plaintiff's IIED claim, and that neither the ACDSS Defendants nor Vaughan-Eden are entitled to reporter immunity under Virginia Code § 632.-1512.  I also find Plaintiff has alleged a plausible IIED claim at this stage against the ACDSS Defendants and Vaughan-Eden.  Finally, I will not dismiss Plaintiff's punitive damages claim against Vaughan-Eden, but I will strike the damages claim above Virginia's $350,000 statutory cap, and I will strike Plaintiff's claim for attorneys' fees. Therefore, I hereby DENY the ACDSS Defendants' Motion to Dismiss (docket no. 144), and GRANT IN PART and DENY IN PART Vaughan-Eden's Motion to Dismiss (docket no. 150).

The Clerk of the Court is hereby directed to send a certified copy of this Order to all counsel of record.

Entered this 14th day of January, 2014.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE

43